**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HELFERICH PATENT LICENSING, LLC, )<br>)<br>v. )<br>)<br>THE NEW YORK TIMES COMPANY, ) | No. 1:10-cv-04387 |
| )<br>HELFERICH PATENT LICENSING, LLC, )<br>)<br>v. )<br>)<br>G4 MEDIA, LLC. ) | No. 1:11-cv-07395 |
| )<br>HELFERICH PATENT LICENSING, LLC, )<br>)<br>v. )<br>)<br>CBS CORPORATION, ) | No. 1:11-cv-07607 |
| )<br>HELFERICH PATENT LICENSING, LLC, )<br>)<br>v. )<br>)<br>BRAVO MEDIA, LLC ) | No. 1:11-cv-07647 |
| )<br>HELFERICH PATENT LICENSING, LLC, )<br>)<br>v. )<br>)<br>J.C. PENNEY CORPORATION, INC. ) | No. 1:11-cv-9143 |

**HELFERICH'S RESPONSE TO MOTION TO EXPEDITE EXHAUSTION[1]**

---

[1] Helferich Patent Licensing, LLC files this consolidated opposition to the Motion to Expedite Exhaustion Briefing filed by JC Penney (No. 1:11-cv-9143, Dkt. 57, hereinafter "Motion"); and joined in by the New York Times (No. 1:10-cv-4387, Dkt. 161; "NYT Joinder") and CBS, Bravo Media and G4 Media (*see* No. 1:11-cv-7607, Dkt. 62) (hereinafter, jointly, "defendants").

Defendants seek in this motion to effectively stay all proceedings in these related cases for the next eight months, except to address the single defense of patent exhaustion. The Court should reject the invitation to once again impose a *de facto* stay of Helferich's case.

To be clear, Helferich **does not oppose** an expedited schedule for consideration of the exhaustion defense at about the same time as that requested by defendants; namely in April 2013. However, given the rich reexamination record, Helferich submits that the exhaustion defense can be tried in or about April 2013, *after* mutual exchange of preliminary contentions (as required by the local rules), *after* a full claim construction hearing, and *along with* at least the "common" invalidity defenses where witnesses and testimony will clearly overlap. Helferich's proposal is even-handed and moves the parties and the Court down the path to a final resolution. It enables trial of the exhaustion defense efficiently, promptly and, most importantly, on an informed basis.

Defendants are clearly wrong to assert that "Helferich's case is a classic example of patent exhaustion." Motion at 5. To the contrary, Helferich will establish through proper claim construction and consideration of the novelty and infringement of the asserted claims that:

- the asserted "content claims" (especially those confirmed patentable in the reexaminations) are separate and distinct from the "handsets" claims, and add material, important and novel features carried out by the content providers that are *not* embodied in handsets;

- handsets have substantial uses that do not infringe the content claims, and that practicing the inventions defined by the content claims is not the only reasonable and intended use of handsets; and

- the handset licenses granted rights *only* to the handset claims, and specifically and carefully excluded and reserved rights to separate and distinct claims of

infringement for the materially different activities of the content providers. If Helferich is right, there can be no exhaustion.

Thus, the underlying issues relevant to exhaustion are informed by – if not fully dependent on – the Court's claim construction and the jury's findings regarding *at least* the novelty of the content claims. Specifically, the Court's claim construction process will determine whether the inventions defined by the Helferich "content claims" are indeed directed to *separate and distinct* inventions from those licensed to the handset companies. Further, the jury's findings with respect to novelty will address whether the properly defined content claims recite ordinary processes merely added to steps practiced by handsets (as asserted by defendants) or define material and patentably distinct additional features practiced by the content providers (as Helferich asserts).

### A.     Defendants' Proposed Schedule is a One-Sided Stay of the Case.

The Court has heard before from defendants that these cases should be stayed pending "potentially dispositive" proceedings; Helferich even consented to one such stay. However, after multiple rounds of reexaminations resolved in Helferich's favor, the defendants' efforts to continue the stay of proceedings were denied as "strategic delay tactics." *See Helferich Patent Licensing, L.L.C. v. New York Times Co.*, No. 1:10-cv-04387 (Dkt. 149), 2012 WL 1813665 (N.D. Ill. 2012). The current motion is more of the same; only this time seeking a *unilateral de facto* stay of Helferich's side of the case to enable defendants to proceed only on their singular defense of exhaustion. Worse, defendants ask this Court to decide exhaustion in a vacuum, without first deciding what the content claims mean or cover, and further, without deciding if the content claims recite material, patentably distinct operations or structures practiced by the content providers.

3

Helferich respectfully submits that the plan proposed by defendants puts the proverbial cart before the horse, and not only causes delay and prejudice to Helferich, but invites error. Helferich further submits that the parties and Court will be in a better position to address exhaustion and other common defenses on the same timetable proposed by defendants, after first completing a claim construction hearing.

**B.  Factual Background: The Helferich Portfolio Covers Patentably Distinct Activities which Have Been Carefully and Separately Licensed**

Helferich's portfolio includes more than 2000 claims. Among other fields of use, the claims cover systems and processes infringed by handset manufacturers, as well as claims covering separate and distinct systems and processes infringed by content providers. Accordingly, Helferich carefully licensed separate and distinct claims to those thatspecifically infringed those claims in separate and distinct fields. Far from being a "classic case of exhaustion," as alleged by defendants, Helferich has engaged in standard licensing practices.

Thus, Helferich carefully limited any rights granted under the handset licenses to only the "handset claims" infringed by "Mobile Wireless Communication Devices" (i.e., "handsets").[2] The handset licenses did *not* include, and *expressly reserved* from the license grant, the separate and distinct inventions defined by the "content claims." In fact, the handset licensees agreed to the following:

> 3.e(i) <u>Reserved Claims</u>:  There are more than one thousand issued and pending claims in the Licensed Patents and Applications defining many distinct inventions. . . . not Infringed by Licensee [the handset company] because they expressly recite material additional operations that are carried out (or material additional structure that is added) by Third Parties, including . . . Wireless

---

[2] Helferich notes that there are approximately 28 handset licenses. Each license will have certain terms unique to each handset company. However, for purposes of this motion, Helferich represents that the "Reserved Claims" and "Reserved Causes of Action" provisions set forth in this section are reflected in each handset license.

4

> Content Provider[s] . . . and/or are not substantially embodied in the products, services or methods within the scope of the Licensed Fields."

Consistent with the above, the handset licensees also agreed that Helferich properly reserved (and did not exhaust) causes of action against the content providers for infringement of the separate and distinct content claims:

> 3.e(ii) <u>Reserved Causes of Action Against Third Parties</u>: Accordingly, notwithstanding any other clause of this Agreement . . . HPL expressly reserves the right to assert claims, file suit, or maintain causes of action (hereafter "Reserved Causes of Action") against . . . Wireless Content Provider[s] . . . for Infringement of any claim of any of the Licensed Patents and Applications due to material additional operations that are carried out or structure that is added by such Third Parties to any product, service, or method within the scope of the Licensed Fields.

Thus, contrary to defendants' assertions, Helferich is not here asserting infringement of claims against defendant content providers that are "embodied" in the handsets or that were licensed to the handset manufacturers. Rather, Helferich is asserting that the content providers infringe distinct content claims that recite material (indeed novel) additional operations carried out by the content providers, and further, that those content claims are not embodied in the handsets, are not infringed by the handsets, and were properly "carved out" and reserved from the handset licenses.

    C.    **The Law of Exhaustion**

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008). In the case of a method patent, exhaustion applies where the method is "'embodied' in a product, the sale of which exhausts patent rights." *Id.* at 628. A product "embodies" the patent if two conditions are met: 1) where the "only reasonable and intended use [of the previously sold item] was to practice the patent," *id.* at 631, and 2) the

5

previously sold item embodies the "essential features" of the patented invention, i.e., "constitute[s] a material part of the patented invention and all but completely practice[s] the patent," *id.* at 633.

Thus, in *Quanta*, after lengthy discovery, the defendants argued that LGE's patents were exhausted:

> There is no genuine dispute that Intel's microprocessors and chipsets "embod[y] essential features of" each of LGE's combination or method patents. *Univis*, 316 U.S. at 250–51. The petition plainly asserted that "the chips sold by Intel clearly embraced the 'essential features' of the asserted patents, which LGE contends are infringed merely by combining the chips with generic components such as memory." Pet. 18. LGE did not dispute that characterization in its opposition or supplemental filing, and hence has waived the right to do so. S. Ct. R. 15.2. . . . And throughout the course of a lengthy discovery dispute with Intel, LGE repeatedly assured the court that Intel's products "indisputably comprise key aspects of LGE's infringement contentions.[3]

The Supreme Court in *Quanta* made clear that exhaustion is invoked where the allegedly infringing operations are merely common processes using generic components, and are not themselves unique or inventive. Specifically, it stated with respect to its earlier decision in *United States v. Univis Lens Co.*, 316 U/ S. 241 (1942):

> The finishing process performed by the finishing and prescription retailers after the fusing was not unique. As the United States explained:
>
>> "The finishing licensees finish Univis lens blanks in precisely the same manner as they finish all other bifocal lens blanks. Indeed, appellees have never contended that their licensing system is supported by patents covering methods or processes relating to the finishing of lens blanks. Consequently, it appears that appellees perform all of the operations which contribute any claimed element of novelty to Univis lenses."
>
> While the Court assumed that the finishing process was covered by the patents, and the District Court found that it was necessary to make a working lens, the grinding process was not central to the patents. That standard process was not

---

[3] Brief for Petitioners at 6, *Quanta Computer, Inc. v. LG Electronics, Inc.*, No. 06-937 (U.S. Supreme Court).

> included in detail in any of the patents and was not referred to at all in two of the patents. Those that did mention the finishing process treated it as incidental to the invention, noting, for example, that "[t]he blank is then ground in the usual manner," or simply that the blank is "then ground and polished."

*Quanta*, 553 U.S. at 632-33 (citations omitted). Likewise, with respect to the Intel processors at issue in *Quanta*, the Court found:

> Like the Univis lens blanks, the Intel Products constitute a material part of the patented invention and all but completely practice the patent. Here, as in *Univis*, the incomplete article substantially embodies the patent because the only step necessary to practice the patent is the application of common processes or the addition of standard parts. Everything inventive about each patent is embodied in the Intel Products.

*Id.* at 633.

The requirement that the product "embody" the essential features of the patented invention is most recently reflected in the highly publicized verdict in favor of Apple against Samsung, in which the issue of exhaustion was presented *to the jury* based on the following instruction:

> I will now instruct you on how to decide Apple's defense of patent exhaustion. Apple contends that Samsung is barred from enforcing the '516 and '941 patents against Apple's Accused iPhone and iPad products because they incorporate baseband chips that Intel sold to Apple with authorization from Samsung.
>
> To prevail on the defense of patent exhaustion, Apple must prove that the following is more likely true than not:
>
> > **First**, that Intel was authorized to sell the baseband chips under the terms of the license agreement between Samsung and Intel;
> >
> > **Second**, that the sales were made in the United States. The location of the sale depends on many factors, and you may find that the sale occurred in several places. A sale occurs wherever the "essential activities" of the sale take place. The essential activities include, for example, negotiating the contract and performing obligations under the contract; and

>**Third**, that, if the accused products infringe, it is because the baseband chips substantially embody the '516 and/or '941 patents. The baseband chips embody the relevant patent if they include all the inventive aspects of the patented device.
>
>Apple must prove all three of these elements to prevail on this defense of patent exhaustion. If Apple does not prove any one of these elements, you must reject Apple's affirmative defense and find for Samsung on this issue. If you find that Apple has proven all three elements, you must find for Apple on this issue.

Final Jury Instructions at 48, *Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-01846 (N.D. Cal. Dkt. 1893).

Consistent with the Supreme Court decisions, in order for defendants to succeed on a defense of exhaustion, they must demonstrate (among other things) that the handsets "include all the inventive aspects" of the content claims. In other words, if the content claims recite inventive aspects *not included* in the handsets themselves, but rather, practiced by the content providers, then there can be no exhaustion. A resolution of these issues clearly depends on claim construction, a consideration of novelty and an understanding of the operation of handsets relative to the accused content provider systems and methods.

### D. Determination of Patent Exhaustion Requires Claim Construction and an Understanding of the Novelty of the Content Claims

As the above discussion makes clear, consideration of patent exhaustion in this case requires a resolution of whether the licensed handsets embody "the essential features" of the now asserted content claims. Unlike the *Univis* case, Helferich contends that separately claimed content delivery processes are unique, because the content claims define material additional operations or structure attributable to the content providers (not the handsets). Those determinations require an understanding of the scope of the content claims, which is determined in a claim construction hearing. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) ("the claim must be properly construed to determine its scope and

meaning"). The need to construe the scope of the claims is starkly demonstrated by the NYT Joinder, which grossly mischaracterizes the asserted claims: "all of HPL's patent claims require a user to act on a text message received at a mobile phone." *Id.* at 3.

Similarly, exhaustion requires a finding that the previously licensed handsets "substantially embody" the now asserted content claims (as properly construed) because "the only step necessary to practice" the content claims is the application of "common processes or the addition of standard parts," and further, because "everything inventive" about each content claims is "embodied in" the handsets. *See Quanta*, 553 U.S. 633. These factual determinations are intertwined with the jury's role in determining facts relating to validity (*i.e*, are the parts "common or standard"), if not also infringement (*i.e.*, is the content providers' infringement "substantially embodied" in the handsets). Helferich will show at trial that the separate and distinct inventions in the content claims add novel, material and additional elements over the prior art, and further, that those additional elements are not included in or practiced by the handsets. Thus, in addition to claim construction, at least the validity determinations are also critical to a proper understanding of the exhaustion issue.

Helferich does not attempt to provide its claim construction or validity analysis here, in the context of a procedural motion to expedite the exhaustion hearing. Instead, Helferich merely previews what it will prove at trial: that the defendants sweeping generalizations regarding Helferich's "patents" and "claims" are clearly erroneous. Contrary to defendants' assertions, Helferich's detailed and comprehensive patent specifications describe numerous distinct and different inventions, and have resulted in more than fifty patents issued worldwide, including more than thirty in the United States alone. Moreover, as confirmed by the Patent Office in the

concluded reexamination proceedings, the content claims define inventions that are patentably distinct from the handset claims.

Thus, for example, the Patent Office issued Helferich hundreds of claims in the "handset field" that recite patentably novel, distinct and important inventions *practiced by handsets*. A few examples of those distinct inventions include:

1. handsets that have special memory/cache management features for erasing received information without erasing an identifier of the information. *See, e.g.,* Claim 44 of U.S. Patent No. 6,087,956.

2. handsets that provide two alerts to the user – one when a message is received and another when a command is completed. *See, e.g.,* Claim 7 of U.S. Patent No. 7,280,838.

3. handsets that provide a user the option to turn on and off transmission of acknowledgments of received information. *See, e.g.,* Claim 1 of U.S. Patent No. 7,376,432.

4. handsets that enable a user to select available audio information and thereafter automatically access and play the audio information regardless of whether the audio information is stored locally or remotely. *See, e.g.,* Claim 1 of U.S. Patent No. 7,146,157.

Clearly, the above "handset" claims are not asserted against the content providers, and the content providers will readily admit that their accused operations do not practice, embody or infringe the above (or numerous other) "handset" claims. Rather, Helferich asserted that the handset companies infringed the handset claims.

In contrast, the "content claims" asserted here recite additional and materially different inventions that are *used by content providers* to create, store, update, and cause delivery of

electronic messages and related content to mobile phones. The content providers are not adding simply "generic" or "common structure or operations" to previously sold handsets. Again, a few simple examples are instructive:

1. content providers creating messages that include special "notifications" of content that include a system identifier, where the content provider receives the system identifier from an identification service. *See, e.g.,* Claim 6 of U.S. Patent No. 7,835,757.

2. content providers creating "dynamic content" in which the content is updated or changed *after* a notification is caused to be sent, but *before* a request is received to download the content. *See, e.g.,* Claim 1 of U.S. Patent No. 8,116,741.

3. content provision using a page notification that indicates that the content is available for a specified time, and in some cases, where the content provider causes the content to become inaccessible after the specified time. *See, e.g.,* Claim 1 of U.S. Patent No. 8,134,450.

4. content providers causing transmission of "error status information" to a recipient and thereafter causing transmission of content after receipt of a request based on error status information. *See, e.g.,* Claim 1 of 8,107,601

5. content providers creating messages that identify available content and identify or establish a system to which respond to contact to trigger or begin the content retrieval process. *See, e.g.,* Claim 25 of U.S. Patent No. 7,835,757.

The above content claims are not, and could not be, asserted as infringed by "handsets." Moreover, as agreed by handset companies in licenses, the handsets clearly do not "embody all the inventive aspects" recited in those content claims. Rather, as evidenced by over 120 content licenses signed by the world's most sophisticated content providers, it is the content providers

themselves that conduct the material additional operations that result in infringement of the separate and distinct content claims.

Helferich fully expects that the defendants will disagree regarding what Helferich's various content claims cover, and whether the handsets "include all the inventive aspects" of the content claims. Ultimately, the Court and jury will determine who is correct *after* proper construction of the "reserved" content claims, and consideration of evidence regarding the material additional features of the content claims not embodied in the licensed handsets.

### E. E. Patent Exhaustion is Properly Decided by the Jury

Defendants repeatedly state, without any supporting citation, that the issue of patent exhaustion is a legal one for the judge. Helferich has been unable to find a single opinion stating defendants' position. Indeed, Helferich notes that in *Univis* and *Quanta*, the issue was presented on undisputed facts establishing that the asserted claims were in fact substantially embodied in the previously licensed or sold product, and that the accused downstream infringers used only common processes and standard components.

Helferich submits that the exhaustion defense here, given the record and disputed issues, is most properly tried to the jury. Patent defenses are commonly tried to a jury, and in the most recent case, exhaustion was in fact tried to the jury. Amended Verdict Form at 20, Question 33 re Patent Exhaustion, *Apple, Inc. v. Samsung Electronics Co.*, No. 11-CV-01846 (N.D. Cal. Dkt. 1931). Thus, Helferich here submits, and will request at the appropriate time, that the exhaustion defense be tried to a jury along with *at least* the common invalidity defenses. However, in accordance with Helferich's proposal, that issue can be decided after the *Markman* hearing.

Regardless of whether exhaustion is tried to a judge or a jury, Helferich believes the decision must be based on the scope of the content claims, thereby dictating at least a prior claim

construction ruling. In addition, exhaustion turns on whether the "inventions" (properly defined by the Court's claim construction), are 1) separate and distinct from the handset claims, and 2) recite material and additional steps, structure or operations relative to the prior art and licensed handsets. Thus, a correct and informed decision relies not only on claim construction, but also an understanding of the important points of novelty recited in the asserted claims, and whether the handsets include all of those novel features.

### F. Conclusion

There is no case that applies exhaustion where a patentee's separate, distinct and novel inventions are properly licensed in separate and distinct fields to separate and distinct infringers. Thus, the defendants will be asking the Court to extend the reach of the patent exhaustion doctrine to completely new territory. The Court's rulings on claim construction and the trial on the merits of at least the invalidity defenses will enable the Court to assess that request for extension of the law, by addressing the exhaustion defense on a full understanding of the underlying issues.

Helferich has no objection to addressing the exhaustion defense; Helferich simply proposes that it be addressed on a properly informed basis. This is best accomplished by hearing claim construction first, and considering patent exhaustion no sooner than at least the related common invalidity defenses.

RESPECTFULLY SUBMITTED this 29th day of August, 2012

LAW OFFICES OF STEVEN G. LISA, LTD.

By: */s/ Steven G. Lisa*
Steven G. Lisa
Attorney for Plaintiff/Counterdefendant

Steven G. Lisa (Ill. State Bar # 6187348)
Timothy Sperling (Ill. State Bar # 6283854)
Jon E. Kappes (Ill. State Bar # 6291678)
Law Offices of Steven G. Lisa, Ltd.
55 West Monroe Street, Suite 3210
Chicago, Illinois 60603
Tel. : (312) 752-4357

Victoria Curtin (NDIL ID #010897)
Victoria Gruver Curtin, P.L.C.
14555 N. Scottsdale Rd., Ste. 160
Scottsdale, Arizona 85254
Tel.: (480) 998-3547

Gerald D. Hosier (Ill. State Bar # 7059)
Law Offices Of Gerald D. Hosier, Ltd.
P.O. BOX 12354
ASPEN, CO 81612
Tel: (970) 920- 3475
Off: (970) 920-3475

14

## CERTIFICATE OF SERVICE

I Laura Keller certify that on August 29, 2012, I personally caused to be served, by CM/ECF filing, a true and correct copy of "**HELFERICH'S RESPONSE TO MOTION TO EXPEDITE EXHAUSTION**":

*/s/ Laura Keller*
Laura Keller