**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, a New York Corporation, *Defendant.* | No. 1:10-cv-04387 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> G4 MEDIA, LLC, a Delaware Limited Liability Company, *Defendant.* | No. 1:11-cv-07395 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> CBS CORPORATION, a Delaware Corporation, *Defendant.* | No. 1:11-cv-07607 <br><br> Hon. John W. Darrah |

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> BRAVO MEDIA, LLC, a New York Limited Liability Company, *Defendant.* | No. 1:11-cv-07647 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> J.C. PENNEY CORPORATION, INC., a Delaware Corporation, *Defendant.* | No. 1:11-cv-09143 <br><br> Hon. John W. Darrah |

**DEFENDANTS' JOINT MEMORANDUM OF LAW
IN SUPPORT OF THEIR JOINT MOTION FOR
SUMMARY JUDGMENT OF PATENT EXHAUSTION
FILED UNDER SEAL**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    A.     HPL Has Licensed Every Handset Sold In The United States ............................... 4

    B.     A Patent Is Exhausted When A Patented Device Is Sold Pursuant To A
          License .................................................................................................................. 5

    C.     HPL's Artful Drafting In Its Licenses Did Not Prevent Exhaustion ..................... 6

    D.     Because Articles Embodying The Essential Features Of HPL's Patents
          Are Licensed, HPL Cannot Sue For Infringement Based On Use Of That
          Essential Feature .................................................................................................. 9

    E.     The Handsets Here Sufficiently Embody The Invention ..................................... 11

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Burke*,
   84 U.S. (17 Wall.) 453 (1873) ........................................................................ 3, 6, 13

*Bloomer v. McQuewan*,
   55 U.S. (14 How.) 539 (1853) ................................................................................. 5

*Bloomer v. Millinger*,
   68 U.S. (1 Wall.) 340 (1864) ................................................................................. 13

*Bobel v. Maxlite, Inc.*, No. 12-C-5346, 2013 WL 142987 (N.D. Ill. Jan. 11, 2013) ..................... 5

*Ethyl Gasoline Corp. v. United States*,
   309 U.S. 436 (1940) ................................................................................................. 5

*Fujitsu Ltd. v. Netgear Inc.*,
   620 F.3d 1321 (Fed. Cir. 2010) ....................................................................... 13, 14

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Corp., Inc.*,
   123 F.3d 1445 (Fed. Cir. 1997) ................................................................................. 8

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) ................................. 14

*In re Katz Interactive Call Processing Patent Litig.*,
   No. 07-CV-2322, 2009 WL 8635161 (C.D. Cal. May 1, 2009) ............................. 15

*In re Longi*,
   759 F.2d 887, 892 (Fed. Cir. 1985) ......................................................................... 7

*Johnston v. Ivac Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989) ............................................................................. 10

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ............................................................................. 14

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   830 F. Supp. 2d 815 (N.D. Cal. 2011) .................................................................. 15

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
   243 U.S. 502 (1917) ................................................................................................. 6

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008) ....................................................................................... passim

*Rubber Co. v. Goodyear*,
   76 U.S. (9 Wall.) 788 (1870) ................................................................................... 8

*Tessera, Inc. v. International Trade Commission*,
   646 F.3d 1357 (Fed. Cir. 2011) ....................................................................... 3, 6, 8

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
   563 F.3d 1271 (Fed. Cir. 2009) ........................................................................... 1, 5

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942)..........................................................................................................passim

**Other Authorities**

James W. Beard, *The Limits of Licensing—*Quanta v. LGE *and the New Doctrine of
  Simultaneous Exhaustion*, 12 UCLA J. L. & Tech. 2 (2008) .....................................................7

## INTRODUCTION

All of the patent infringement allegations raised by Helferich Patent Licensing, LLC ("HPL") against Defendants are precluded under the doctrine of patent exhaustion.[1]  HPL has licensed all of its patents (including those asserted in this case) to the entire U.S. wireless handset industry, thereby authorizing the practice of its patents in every wireless handset in use in the United States.  By doing so, HPL exhausted its patent rights.  HPL's attempt to recover another royalty on the use of the licensed handsets (for which HPL has already been paid), including the use that forms the basis of its infringement allegations against these Defendants, is precluded as a matter of law.  *See Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 630 (2008).

HPL's operative complaints allege that Defendants infringe by causing a text message containing a web link to be sent to a wireless handset and then receiving a request for content when the user of the same wireless handset clicks on the link.  *See* Statement of Undisputed Facts ("SUF") ¶¶ 14-20, 30.  The delivery of content cannot infringe without such a request from the handset.  But those handsets are already licensed, and they embody the invention.  Because HPL's infringement allegations hinge entirely on the capabilities and use of licensed wireless handsets, this Court should dismiss all of HPL's allegations on summary judgment as a matter of law under the doctrine of patent exhaustion.[2]

---

[1]  "Defendants" refers to the New York Times Company ("NYT"); G4 Media, LLC; CBS Corporation; Bravo Media, LLC; and J.C. Penney Corporation, Inc.  This Court has coordinated the above-captioned HPL cases for certain discovery and for purposes of the patent exhaustion issue.  In its Orders of November 8, 2012 and January 15, 2013, the Court instructed Defendants to file their joint motion for summary judgment on the issue of patent exhaustion by March 12, 2013, noting that patent exhaustion could "potentially be case-dispositive."  NYT Dkt. Nos. 172, 197.

[2]  Patent exhaustion, like *res judicata*, stops a lawsuit on the launch-pad.  It is therefore appropriately decided on summary judgment, with no need for claim construction or expert analysis.  *See TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1274 (Fed. Cir. 2009) (affirming exhaustion ruling in similar procedural posture).

HPL seeks to collect multiple royalties from everyone that creates content that might end up being displayed on any handset in the U.S. Indeed, HPL has been blanketing the country with letters to hundreds of companies[3] that use social media services like Facebook and Twitter. *See* SUF ¶ 22. Those companies infringe, according to HPL, because when any Twitter or Facebook user writes a post that has a web link in it, Twitter and Facebook might send that post to followers via a text message (with a string or strings of textual characters in it that the handset interprets to create a clickable link), and some users respond by clicking the link to get more content. In short, HPL believes it has the right to extract royalties from everyone who sends a text message or posts content to social media containing text strings representing web addresses that are interpreted by the social media application or a handset as clickable links—even though HPL has already collected tens of millions of dollars in royalties on every handset in the United States that is capable of receiving a text or social media message with a web address in it, which the handset renders as a clickable link.

Patent law gives a patent holder one bite at the licensing apple and no more. Granting this motion is proper because HPL has already been compensated for all uses of handsets in the United States related to clicking on interpreted links in text messages or social media posts, regardless of who creates them, who sends them to the handsets, and what links handset users choose to click. Absent relief from the Court, HPL will continue its attempt to obtain a huge windfall not contemplated or permitted by law, and many more lawsuits are likely to follow.[4]

---

[3] This case alone involves five defendants and 208 claims. The Arizona case adds six more defendants.

[4] Defendants strenuously deny infringement, in part (but without limitation) for the reason that the defendants are not able to control what handset users do. Defendants also believe that the asserted HPL patent claims are invalid. For the purposes of this motion only, this brief argues that, even if HPL is correct that the defendants practice the invention, HPL's patents

**ARGUMENT**

The "longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. Patent exhaustion removes the "cloud of uncertainty" that would surround "every product" made under license if it was possible that others may be liable for using the licensed product. *Tessera, Inc. v. International Trade Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011). Patent exhaustion ensures that a license "secure[s]" the "rights" to make use of the item "in the ordinary pursuits of life." *Quanta*, 553 U.S. at 625 (citation omitted). Hence, "postsale restrictions" are ineffective as a matter of law. *Id.* at 625-26. A patentee may not extract multiple royalties from different parties based on their use of the same article. *Tessera*, 646 F.3d at 1369 ("patent exhaustion is designed to prevent a double recovery"). That is because "when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use." *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873). Therefore, a patentee cannot recover a second royalty if its infringement theory involves the use of a licensed article; "[s]uch a result would violate the longstanding principle that, when a patented item is once lawfully made and sold, there is no restriction on its *use* to be implied for the benefit of the patentee." *Quanta*, 553 U.S. at 630 (internal punctuation omitted) (emphasis in original).

Here, HPL's infringement theory hinges on the use of licensed wireless handsets. HPL argues that infringement occurs when a Defendant allegedly causes a text message with a link in it to be sent to *a licensed handset*, the *licensed handset user* clicks on the link, and *the licensed handset* responds with a request for content based on what the *licensed handset user* clicked.

---

are exhausted. Should the court deny this motion, the defendants will proceed to demonstrate non-infringement and invalidity.

*See* SUF ¶ 14.  **Every** claim of **every** asserted patent requires the use of a handset to receive a message and initiate a licensed request for content based on an identifier in the message.  And **every** handset in the United States is licensed, according to HPL's own sworn statements.  SUF ¶ 11.  Therefore, every alleged act of infringement occurs on an HPL-licensed device.  HPL's lawsuits are accordingly barred by the doctrine of patent exhaustion.

### A.    HPL Has Licensed Every Handset Sold In The United States

As HPL boasted to the United States Patent and Trademark Office in defending its patents during reexamination, HPL licensed and collected fees from "the **entire** cellular handset industry."  SUF ¶ 11.[5]

Each of HPL's handset licenses conveys rights to all of its patents and patent applications, including **all of the patents-in-suit**.  SUF ¶ 10.  Each license exhausts all patents which require the use of a licensed handset.



SUF ¶ 12.  The licenses by their own terms preclude HPL from bringing **any infringement claim** against those who use the licensed handsets.  SUF ¶ 12.

In addition, HPL granted each licensee a covenant not to sue.

Both the Federal Circuit and this Court have held that such a covenant not to sue

---

[5]  HPL's handset licensees include, at least:  Apple, Samsung, Research in Motion, LG Electronics, Nokia, Microsoft, Motorola, HTC, Amazon.com, Sony, Kyocera, Hewlett-Packard/Palm, Panasonic, Sanyo, Dell, Toshiba, Acer, Sharp, Casio, i-mate, Wistron, Psion, Asustek, Huawei Technologies, NEC, ZTE, Pantech, and UTStarcom.  SUF ¶ 10.

[6]  HPL has yet to provide its license of Nokia based on an alleged objection by Nokia. Magistrate Judge Gilbert has now ordered production of that license.  HPL has not argued that Nokia's license contains different terms or should be treated differently than the others.

exhausts a patent just like a standard license. *See TransCore*, 563 F.3d at 1274-77; *Bobel v. Maxlite, Inc.*, No. 12-C-5346, 2013 WL 142987, at *4 & n.3 (N.D. Ill. Jan. 11, 2013) (holding that a covenant was exhaustive even if it purported to limit the rights of "third parties").

**B.     A Patent Is Exhausted When A Patented Device Is Sold Pursuant To A License**

HPL's covenant not to sue and its licenses to make, use, sell, offer for sale, and import the allegedly patented inventions exhausted all the of HPL's patents-in-suit. When a physical product is made under a valid license, the patent is exhausted and all use of that product for its intended purpose cannot infringe. The exhausted product carries with it the right to use it to practice the patent—by the customer or by others. That is the meaning of the "longstanding doctrine of patent exhaustion." *Quanta*, 553 U.S. at 625.

When a patented invention is sold, ***all*** of the patent's claims—including its method claims—are exhausted. *Id.* at 628-30 (citing *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 446, 457 (1940) and *United States v. Univis Lens Co.*, 316 U.S. 241, 248-51 (1942)). As a result, no use of the patented product can be infringing. *Id. Quanta* specifically considered and ***rejected*** the argument that users "downstream" from the initial licensee "could nonetheless be liable for patent infringement" by virtue of their having used a licensed product. 553 U.S. at 630. The Court explained that "when a patented item is once lawfully made and sold, there is no restriction on its ***use***" that the patentee can impose. *Id.* (emphasis added; internal punctuation omitted). A product's sale, pursuant to a license, comes with the right to use the product without fear of liability for infringement of the patent. The patent is completely exhausted as to that product. In other words, "the initial authorized sale of a patented item terminates ***all patent rights*** to that item." *Id.* at 625 (emphasis added). That has been the law ever since the Supreme Court's early patent cases. *See, e.g., Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1853)

("when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly"); *Adams*, 84 U.S. at 455 ("where a person had purchased a patented machine of the patentee or his assignee, this purchase carried with it the right to the use of that machine so long as it was capable of use"); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917) (an "article sold" under license is "thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it").

### C. HPL's Artful Drafting In Its Licenses Did Not Prevent Exhaustion

HPL's licenses are artfully drafted in a transparent effort to evade the applicability of the patent exhaustion doctrine.



SUF ¶¶ 24-25. As a matter of law, however, HPL's gambit does not permit it to make an end-run around the law of patent exhaustion.

A patentee's attempt to "withhold" or "reserve" any rights to seek additional licensing or royalties for the use of a product, or even to try to expressly state that a patent is not exhausted, is ineffective as a matter of patent law. *See Quanta*, 553 U.S. at 628-30 (a patentee cannot "shield" a "patented item from exhaustion" by refusing to transfer the right to perform "a method claim" in "an assignment contract"). The Supreme Court's patent exhaustion jurisprudence is a rich history of clever patentees, like HPL, who attempt to use various tricks to extract multiple royalties from one product. *See, e.g., id.* at 626 (noting the "frequency with which patent holders were using" cleverly drafted "licenses to limit the use of their products" even in the 1920s) (quotation marks omitted). But the patent exhaustion rule is "straightforward," and not so easily evaded. *Tessera*, 646 F.3d at 1370. In particular, a patentee cannot carve up a patent by claim.

Purporting to license only certain claims will not immunize the remaining claims from exhaustion. The whole patent is exhausted. *Quanta*, 553 U.S. at 635.

A single patent often contains dozens of overlapping claims. If a patentee could save certain patent claims from exhaustion, like LG attempted to do with the method claims in *Quanta*, the purposes of simplicity and surety of use rights that underlie the patent exhaustion rule would be eroded. *See id.* at 629-30 (exhaustion cannot be evaded by "draft[ing]" a patent as "including a method claim for the machine's patented method of performing its task"); James W. Beard, *The Limits of Licensing—*Quanta v. LGE *and the New Doctrine of Simultaneous Exhaustion*, 12 UCLA J. L. & Tech. 2, 21-23 (2008) (explaining that *Quanta* "firmly declar[ed] that the doctrine of exhaustion was not merely a rule that patentees could opt out of via creatively authored licenses" that withhold "a method claim"). (*Quanta* also held the system claims exhausted. 553 U.S. at 622, 631.)

HPL's rule could also allow a patentee to effectively gain hundreds of separately licensable rights from a single patent on ***the same invention***. Each claim could be separately licensed, creating an entire patent portfolio out of a single patent. Such a regime could thereby undermine the prohibition against double patenting. *Cf. In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985) (the rule against "double patenting" "precludes one person from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention").

HPL's rule is not the law. The law is simple: the sale of a device "that partially practice[s] a patent" completely "exhaust[s] ***that patent***." *Quanta*, 553 U.S. at 635 (emphasis added). Whether or not what HPL terms "handset claims" and what it terms "content claims" are "contained in each of the [HPL] Patents" does not save those patents from exhaustion, which

7

occurs through "the sale of" a licensed product. *Id.* at 628. Should a patentee wish to obtain royalties from multiple licenses, each covering a distinct invention, then the patentee needs to file separate patents and then license each different patent to the different target groups. Instead, HPL chose to license ***all the patents-in-suit*** to ***all wireless handset sellers***.

Nothing that occurs after an authorized sale can alter the sale's exhaustive effect. *See Tessera*, 646 F.3d at 1370 (making sale conditional on subsequent events "would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit postsale restrictions on the use of a patented article"). For this reason, even a license that purports to be limited by conditions on its use—such as a statement that a patentee reserves the right to sue another person for the product's use—operates as a matter of law to exhaust the patent. *Id.* Patent exhaustion follows the ***licensed article***. No use of that licensed article to practice the patent, including the use here, can support a claim for infringement; if an infringement theory relies on use of the article and the article is licensed, no such infringement claim will lie. "[W]hen a patentee sells a device without condition, it parts with the right to enforce any patent that the parties might reasonably have contemplated would ***interfere with the use of the purchased device***." *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1455 (Fed. Cir. 1997) (emphasis added).[7]

---

[7] Although it is permissible to carve up an industry horizontally by licensing manufacturers of the product in some fields but not others, such that some articles are licensed and others not (*see*, *e.g.*, *Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 799-800 (1870)), for any particular licensed article no further restrictions may be placed on its use. Vertical licensing schemes (where a patentee obtains a royalty first from the sale of a product and then attempts to obtain another licensing fee from the buyer's use of it and still another fee from another person that creates a system that uses the product) are inconsistent with the principle of patent exhaustion because they seek multiple royalties from the same article. *See Tessera*, 646 F.3d at 1370.

### D. Because Articles Embodying The Essential Features Of HPL's Patents Are Licensed, HPL Cannot Sue For Infringement Based On Use Of That Essential Feature

HPL's infringement allegations are directed to actions by the Defendants that constitute a use of the licensed handsets—an improper attempt at vertical licensing involving the same article. Specifically, for every claim asserted, a licensed patented article—a wireless handset with functionality to render the hyperlink and request content—must be **_used_** to perform the claimed method, by rendering text as a hyperlink and requesting content. Every asserted method claim includes the following basic steps and every asserted system claim operates according to the following operations, as Defendants illustrate with the following flowchart:



Claim 9 of the '838 Patent is representative of the method claims. *See* U.S. Patent No. 7,280,838, col. 21:27-49. It recites stored content (Step 1), the transmission of a "message" with an "information identifier" for locating the content "to the wireless communication device" (Step 2), the "wireless communications device" sending, "as a reply to the" content provider's "message" (necessarily performing Steps 3-4), a "request message" (Step 5), and the content provider's receipt of that message (Step 6). The following is an example of an SMS text message that HPL identified as constituting content that would infringe Claim 9 of the '838 Patent if a handset user received the message and clicked the http://bit.ly/b6nvFF portion, and the

handset sent a request and received the content:

SUF ¶ 21.

HPL's system claims asserted against the Defendants are similar. For example, Claim 26

of the '741 Patent recites "a notification system" that sends a notification with "an information identifier" to a "cell phone" (Steps 1-2), "a request" from "the cell phone" (Steps 3-5), and the content provider's "receipt" of that request (Step 6). All other asserted claims are similar; none could be performed without the involvement of a handset to perform the critical steps 3-5. SUF ¶¶ 15-20, 30. And regardless of how the Court may ultimately construe particular terms within the various claims, the only issue relevant to the instant exhaustion analysis is that a handset is an integral part of each of those claims. That is indisputable on the face of the patents-in-suit. SUF ¶¶ 14-20, 30.[8]

The critical actions, shown in red, are performed as a licensed use of a licensed wireless handset. If content is only created and delivered to the handset, and the user never uses the wireless handset to click on a link (generated by the handset), then the delivery of content will not infringe; all claims require *a request from the licensed handset*. Without the wireless handset performing its licensed function or without the user's response (using the handset), there can be no infringement. *See Johnston v. Ivac Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989) ("To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process.").

When the performance of a claim requires the use of a device, and there is a license covering the use of that device, no infringement suit will lie. In *Quanta*, LG had licensed Intel's microprocessors and was attempting to seek a second license from Quanta for PCs that incorporated the already-licensed Intel microprocessors. 553 U.S. at 631. Because those

---

[8] In its complaints, HPL asserts the following patent claims against various defendants: Claims 2, 10, 13-14, 38-42, 53-54, 71-72, 80, and 84-85 of the '241 Patent; Claims 9-13, 15-20, 97-103, and 105-110 of the '838 Patent; Claims 15-18, 21-33, 36-43, 83-86, 89-94, 97-100, 103-107, and 109 of the '716 Patent; Claims 1-13 and 15-69 of the '757 Patent; Claims 1, 3-4, 9-11, and 16-17 of the '601 Patent; Claims 1-9, 11-18, 20-21, 23-24, and 26-27 of the '741 Patent; and Claims 1, 3-8, 10-15, 17-25, and 27-28 of the '450 Patent.

licensed microprocessors were the "essential features" covered by the patents, the Supreme Court held that LG was precluded from seeking a second license from Quanta for use of those microprocessors. *Id.* at 634.

*Quanta* governs this case. HPL already licensed the wireless handsets. The functionality in those handsets for receiving messages and allowing a user to click on a link (thereby initiating a request for content based on the identifier in the message) is the "essential, or inventive, feature" of HPL's invention. *Id.* at 632. Thus, here, where an essential feature of an accused method or system is licensed, the accused method or system cannot be held to infringe. That the claims also require the delivery of content—a step that is not "unique" or "central" to HPL's supposed invention of text-and-web integration but which is rather a "standard component[]" enabling the invention to be useful—is immaterial. *Id.* at 632-34.

It does not matter whether a patent claim is written with the handset user as the subject of the sentence ("the user sends a request to the content provider") or as the object ("the content provider receives a request from the user"). Phrasing a claim to make a different party the direct infringer cannot make "an end-run around exhaustion." *Id.* at 630. By contrast, under HPL's view, a patentee could (with a modicum of drafting effort) sue or obtain royalties from every person that makes any use of a licensed product by crafting different claims directed at different actions relative to the same wireless handset.

### E. The Handsets Here Sufficiently Embody The Invention

The Supreme Court announced a straightforward explanation of the breadth of patent exhaustion: "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. Despite this clear language, HPL appears to argue that such a rule applies only if the product in question is entirely useless except in practicing the patent. NYT Dkt. No. 163, at 2. That argument focuses on the wrong question. HPL apparently hangs

11

its hat on an offhanded remark from an earlier Supreme Court case, which noted that "the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." *Univis*, 316 U.S. at 249. But the Court did not hold that ***only*** such articles of limited utility are protected by patent exhaustion. Rather, many other cases upon which the Supreme Court has recently relied state the general rule without mentioning any such requirement. *See Quanta*, 533 U.S. at 625-26 (collecting cases).

Patent exhaustion is not so limited. At most, a patented product must "sufficiently embod[y]" the patented invention. *Id.* at 628. Although *Univis* and *Quanta* both involved authorized sales of products with limited non-infringing utility, neither made such limited utility a ***requirement*** for "sufficient embodiment." The "sufficient embodiment" test screens out situations where a defendant claims patent exhaustion by sale of an ***un***patented article. For example, a company with a license on a potato chip patent might also manufacture and sell soda; but sale of the soda does not exhaust the potato chip patent because the soda does not embody the potato chip patent. "The relevant consideration" is not whether the articles sold have multiple uses, but whether they "partially practice" the patent. *Id.* at 635.

Here, there is no question that there has been an authorized sale of a patented article. The handset manufacturers all took a license so they could manufacture and sell handsets. Such a license was necessary (at least under HPL's infringement theory) because the handsets contain all the inventive features of the HPL patents and are necessary to practice the patents—they have functionality to enable them to receive a message, present a portion of the message as a link and, upon user input, request content associated with the link. The handsets, therefore, "embody[]" the patent's "essential features." *Id.* They thus meet the one "example" the Supreme Court gave

12

of how an article might "partially practice" a patent. *Id.* And, of course, a device may embody a patent's essential features while having many other functions. Indeed, a device might have so many different features that there are multiple patents covering it. But "the exhaustion analysis is not altered by the fact that more than one patent is practiced by the same product." *Id.* One article can exhaust multiple patents. *Id.* at 634-35.

Where a product is manufactured pursuant to the patent license, such that its manufacture without a license would infringe, then there is patent exhaustion. That is what "sufficiently embody" means. *See Adams*, 84 U.S. at 455 ("The true ground on which the[ Supreme Court's patent exhaustion] decisions rest is that the sale by a person who has the full right to make, sell, and use such a machine carries with it the right to the use of that machine to the full extent to which it can be used in point of time."); *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1864) (when patentees "have made and vended to others to be used one or more of the things patented, to that extent they have parted with their exclusive right").

In any event, the relevant feature of the handsets sold here ***does not*** have any reasonable and intended noninfringing use (under HPL's broad infringement theory). *See Univis*, 316 U.S. at 249. The "noninfringing use" question is ***not*** whether a person could do anything with the handset other than practice the patent. The question is whether the ***specific feature at issue***—the ability to receive text messages with strings of text that the handset interprets as links and, when the user clicks on the text string to request content, the capability of downloading and displaying that content—has substantial noninfringing uses. *See*, *e.g.*, *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) ("in determining whether there are substantial noninfringing uses, we must only consider the particular tool in question when that tool is a separate and distinct feature of a larger product") (internal quotation marks omitted). So, for example, the Federal

13

Circuit has held that a product had no substantial noninfringing uses because the relevant feature in that product—one piece of software that fragmented wireless messages into smaller pieces for transmission—would always infringe, even though the products as a whole—which included virtually any device with wireless networking capabilities—had many other uses. *Id.* at 1325, 1330. The court relatedly "held that the many uses of [Microsoft] Word that did not involve the XML Editor" at issue in another case "did not constitute substantial noninfringing uses," even though "Microsoft Word was the larger product." *Id.* at 1330 (describing *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011)). Similarly, the court held a date-picking tool within Microsoft Outlook (a program with numerous other features) "suitable only for an infringing use." *Lucent Techs.*, *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009). "Inclusion of the date-picker feature within a larger program does not change the date-picker's ability to infringe." *Id.*

Here, as a matter of law, the relevant feature is the handset's functionality for receiving a text message and, upon user input, requesting content associated with an identifier in the message. SUF ¶¶ 14-20, 30. When that feature is "activated," the product is practicing the patent. *Fujitsu*, 620 F.3d at 1331; *see also Quanta*, 553 U.S. at 632 n.6 (it is irrelevant that the feature can be disabled). Indisputably, the only time the feature at issue is activated is when the handset receives a message containing strings of text interpretable by a handset as a web address (Steps 1-2 in the flowchart, *supra* at 9), the handset renders that address as a hyperlink (Step 3)—a link that is only useful for a user to click on to receive content (Step 4)—and the handset requests the content at the address associated with the link (Step 5-6). SUF ¶¶ 15-20, 30. The "only object of the sale" of the feature at issue here is to practice the invention. *Univis*, 316 U.S. at 249.

14

This case resembles *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 842 (N.D. Cal. 2011). There, the court held that although the phone system's software as a whole "can be used to perform tasks other than those that are alleged to constitute infringement of the [asserted] patent, e.g., sending and receiving email, placing telephone calls and managing dates," that was not "the inquiry for determining whether a product has substantial noninfringing uses." *Id.* at 841-42. The question was whether the use of the infringing "component" of the phone system software "directly infringes" the patent. *Id.* at 842.

Although *Mformation* involved contributory infringement, rather than patent exhaustion, the "noninfringing use" analysis is the same. If the sale of the products at issue "would constitute contributory infringement" if *un*licensed, then—when the sale of those products *is* licensed—that sale is exhaustive. *Univis*, 316 U.S. at 249; *see also In re Katz Interactive Call Processing Patent Litig.*, No. 07-CV-2322, 2009 WL 8635161, at *6 (C.D. Cal. May 1, 2009) ("the question of whether a product embodies the essential features of a patent turns on the same factors as the question of contributory infringement"). This rule of symmetry prevents patentees from extracting both licensing fees from the seller and infringement damages from the end user, on the same patented article. That is HPL's goal here. But the patent exhaustion doctrine does not allow HPL to take two bites out of the same article.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court grant their motion for summary judgment of patent exhaustion.

Dated: March 12, 2013                                    Respectfully submitted,

 /s/ R. David Donoghue                                    /s/ Brian M. Buroker
R. David Donoghue                                         Brian M. Buroker
Daniel L. Farris                                          Matthew F. Chandler
Anthony J. Fuga                                           **GIBSON, DUNN & CRUTCHER LLP**
**HOLLAND & KNIGHT LLP**                                  1050 Connecticut Avenue, N.W.

131 South Dearborn Street, 30th floor
Chicago, IL 60603
Tel: (312) 263-3600
Fax: (312) 578-6666
david.donoghue@hklaw.com
daniel.farris@hklaw.com
Anthony.fuga@hklaw.com

J. Mitchell Herbert, Jr. (*pro hac vice*)
**HOLLAND & KNIGHT LLP**
10 St. James Ave., 11th Floor
Boston, MA 02116
Tel: (617) 523-2700
Fax: (617) 523-6850
mitchell.herbert@hklaw.com

***Counsel for Defendant J.C. Penney
Corporation, Inc.***

 /s/ Michael Markman
Michael M. Markman (N.D. Ill. ID No.
191388)
Robert Williams (N.D. Ill. ID No. 247428)
**COVINGTON & BURLING LLP**
One Front Street
San Francisco, CA 94111
Tel: (415) 591-6000
Fax: (415) 591-6091

David M. Airan
**LEYDIG, VOIT & MAYER, LTD.**
180 N. Stetson Avenue, Suite 4900
Chicago, IL 60601-6731
Tel: (312) 616-5600
Fax: (312) 616-5700

***Counsel for Defendants G4 Media, LLC; CBS
Corporation; and Bravo Media, LLC***

Washington, District of Columbia  20036
Tel: (202) 955-8541

Michael R. Weiner (Ill. Bar No. 06217025)
Julianne Marie Hartzell (Ill. Bar No.
06270593)
**MARSHALL, GERSTEIN & BORUN LLP**
233 South Wacker Drive
6300 Sears Tower
Chicago, Illinois  60606-6357
Tel: (312) 474-6300
mweiner@marshallip.com
jhartzell@marshallip.com

Kenneth Richieri, Esq. (Of Counsel)
The New York Times Company
620 Eighth Avenue, 17th Floor
New York, New York  10018
Tel: (212) 556-1995
richierk@nytimes.com

***Counsel for Defendant and Counterclaim
Plaintiff the New York Times Company***

<u>**CERTIFICATE OF SERVICE**</u>

       I, Brian M. Buroker, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 12th day of March, 2013, I caused to be served this DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT OF PATENT EXHAUSTION, via CM/ECF and electronic mail, upon the following counsel of record:

<table>
<tr>
<td>

Steven G. Lisa<br>
Donald J. Lisa<br>
James David Busch<br>
Jon E. Kappes<br>
Justin Joseph Lesko<br>
Timothy Sperling<br>
Law Offices of Steven G. Lisa, Ltd.<br>
55 W. Monroe St., Suite 3210<br>
Chicago, IL 60603<br>
stevelisa@patentit.com<br>
donlisa@patentit.com<br>
jamesbusch@patentit.com<br>
jonkappes@patentit.com<br>
justinlesko@patentit.com<br>
timsperling@patentit.com

</td>
<td>

Victoria Curtin<br>
Victoria Gruver Curtin, PLC<br>
14555 North Scottsdale Road<br>
Suite 160<br>
Scottsdale, AZ 85254<br>
victoria@vcurtin.com<br>
<br>
<br>
Gerald Douglas Hosier<br>
Law Offices of Gerald D. Hosier, Ltd.<br>
P.O. Box 12354<br>
Aspen, CO 81612<br>
wizard@ozpd.com

</td>
</tr>
</table>

                    /s/ Brian M. Buroker
                    Brian M. Buroker