**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| v. | ) | No. 1:10-cv-04387 |
| | ) | |
| THE NEW YORK TIMES COMPANY, | ) | |

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| | ) | No. 1:11-cv-07395 |
| v. | ) | |
| | ) | |
| G4 MEDIA, LLC. | ) | |

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| | ) | No. 1:11-cv-07607 |
| v. | ) | |
| | ) | |
| CBS CORPORATION, | ) | |

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| | ) | No. 1:11-cv-07647 |
| v. | ) | |
| | ) | |
| BRAVO MEDIA, LLC | ) | |

| | | |
|---|---|---|
| HELFERICH PATENT LICENSING, LLC, | ) | |
| | ) | |
| | ) | No. 1:11-cv-9143 |
| v. | ) | |
| | ) | |
| J.C. PENNEY CORPORATION, INC. | ) | |

**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT
ON PATENT EXHAUSTION**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................1

II.   FACTUAL BACKGROUND ..........................................................................2

III.   EXHAUSTION APPLIES TO DOWNSTREAM PURCHASERS OF AN "AUTHORIZED ITEM" ...........................................................................................................3

IV.   EXHAUSTION DOES NOT AUTOMATICALLY APPLY TO "ALL INVENTIONS" DESCRIBED IN A COMMON PATENT SPECIFICATION ...................................................7

    A.  The Statute and PTO Rules Recognize That A Single Patent Specification May Describe Many "Independent And Distinct" Inventions. ...............................................7

    B.  Field Of Use Licenses Have Long Been Approved ....................................................11

    C.  Exhaustion Has Only Applied To The "Authorized Item" – Not Other Distinctly Different Items Also Described In The Patent ..................................................................13

V.   CONCLUSION.................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Adams v. Burke*, 84 U.S. 453 (1873)........................................................................6

*Aiken v. Manchester Print Works*, 1 F.Cas. 245 (N.H. 1865)..................................12

*Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343 (Fed.Cir. 2003) ...............................7

*Aro Mfg.Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961) ...........5, 10

*Bloomer v. McQuewan*, 55 U.S. 539 (1852)..........................................................4, 12

*C.& R. Research Corp. v. Write*, 19 F.2d 380 (D.Del. 1927) ...................................12

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940) ....................................5

*General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938).................... 11

*General Talking Pictures Corp. v. Western Electric Co.*, 305 U.S. 124 (1938).................... 11

*Hunt v. Armour & Co.*, 185 F.2d 722 (7th Cir. 1950) ........................................... 12

*Kirtsaeng v. John Wiley & Sons, Inc.*, 2013 WL 1104736 (S.Ct. 3/19/13) ..............................4

*LG Electronics, Inc. v. Asustek Computer, Inc.*, 2002 WL 31996860 (N.D. Cal. 2002) and 248 F.Supp.2d 912 (N.D. Cal. 2003) ........................................................................ 14

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917).....................10

*Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010) ..............................7, 11

*Quanta Computer Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008)........................................................5, 6, 7, 11, 12, 13, 14

*United States v. Univis Lens Co.*, 316 U.S. 241 (1942).........................................5, 11, 13, 14

*Wilson v. Rousseau*, 45 U.S. 646 (1846)...................................................................4

## United States Code

35 U.S.C. § 112....................................................................................................8

35 U.S.C. § 121.........................................................................................1, 2, 9, 14

**Federal Rules**

Fed. R. Civ. P. 56 ................................................................................................................15

**Manual of Patent Examination Procedure**

MPEP § 803 ........................................................................................................................9

MPEP § 802.01 ..............................................................................................................9, 10

**Article**

John W. Osborne, "An Avoidable Collision in Quanta v. LGE", 7 J Marshall Rev. Intell.
Prop. 245, at 270 (2008) ....................................................................................................10

## I. INTRODUCTION

Helferich Patent Licensing, LLC ("Helferich") moves for summary judgment on the defense of patent exhaustion ("Exhaustion").[1]  In their Joint Memorandum of Law (NYT Dkt. 231, "Brief"), Defendants make an unprecedented request for the Court to grant free licenses for their separate and distinct infringement of the Helferich patents by extending Exhaustion well beyond any prior application of the law.   Defendants' requested expansion of Exhaustion fails, as a matter of law based on undisputed facts, for at least two reasons.

First, the Supreme Court has repeatedly explained that the purpose of Exhaustion is to protect the "downstream" purchaser of a particular authorized item, so that the purchaser can use that authorized item as intended without fear that he will be subject to further charges of infringement.  It is undisputed that Defendants are not downstream purchasers of the handsets. Accordingly, as a matter of law, Exhaustion cannot apply to them.

Second, inventors are allowed to describe in an application separate and distinct, but potentially related, inventions.  This common occurrence is recognized in 35 U.S.C. § 121, which gives the Patent Office ("PTO") discretion to issue restriction requirements when "two or more independent and distinct inventions are claimed in one application." Defendants ask the Court to be the first to expand Exhaustion *automatically* to *all* of the separate and distinct "patented inventions" described and claimed in "an application" simply as a result of an initial

---

[1] "Defendants" refers to the entities which pled Exhaustion: the New York Times Co. (No. 1:10 cv 4387, Dkt. 140, "Answer, Affirmative Defenses and Counterclaims, etc.," Fifth Affirmative Defense); G4 Media, LLC (No. 1:11 cv 7395, Dkt. 51, "Answer to Amended Complaint, Defenses and Counterclaims," Tenth Defense); CBS Corp., No. 1:11 cv 7607, Dkt. 45, "Answer to Amended Complaint, Defenses and Counterclaims," Tenth Defense); Bravo Media, LLC, No. 1:11 cv 7647, Dkt. 46, "Answer to Amended Complaint, Defenses and Counterclaims," Tenth Defense); J.C. Penney Corp., Inc. (No. 1:11 cv 9143, Dkt. 34 "Answer to Second Amended Complaint," Twentieth-Twenty-fifth Affirmative Defenses).

license of *only* one of the distinct inventions.[2]  However, extending Exhaustion "patent-by-patent" essentially eviscerates § 121 and overturns 150 year of "field of use licensing." Granting Defendants' wish would bestow free licenses to ***all*** "independent and distinct" inventions described in a patent upon the license of only one, even if reserved from prior licenses.

For the above reasons, Helferich requests that the Court enter summary judgment as a matter of law that Exhaustion does not extend to either: (1) direct infringement by third parties that are not authorized purchasers/users of the sold item, or (2) independent and distinct inventions described in the same patent.

## II.  FACTUAL BACKGROUND

The Court needs to consider only one fact in support of Helferich's cross motion:

- *Defendants are not "purchasers" of authorized handsets*.

*See* HPL's Statement of Undisputed Facts in Support of Cross Motion at 41.

More specifically, Defendants do not assert that Exhaustion flows from *their* purchase or direct *use* of a previously licensed handset.  To the contrary, in the block diagram on page 9 of their Brief ("Defendants' Diagram"), Defendants color in "red" the operations they assert are performed *by the licensed handsets*, and color in "black" the operations perform *by them* (and *not* the handsets).  Though Defendants' Diagram is incorrect as shown in Helferich's opposition memorandum ("Helferich's Memo."),[3] it nonetheless reflects Defendants' admission that they

---

[2] *See* Brief at 5 ("When a patented invention is sold, ***all*** of the patent's claims—including its method claims—are exhausted")( emphasis original); *id*. at 8 ("Should a patentee wish to obtain royalties from multiple licenses, each covering a distinct invention, then the patentee needs to file separate patents and then license each different patent to the different target groups.")

[3] Defendants' Diagram grossly oversimplifies and omits essential elements from the Content Claims that are performed by Defendants, and incorrectly characterizes operations performed by the handsets as included in the asserted claims.  *See* Response Statement of Facts ¶ 36.  Regardless, for purposes of this Motion, Helferich and the Court can rely on the admissions by Defendants in the Diagram.

perform *at least* the following content delivery operations *without using handsets*:

- **"Step 1: Content is Created"** – In Step 1, Defendants assert they: **(i)** create the content..

- **"Step 2: Text message containing an information identifier is delivered to a handset"** – In Step 2, Defendants assert they: **(ii)** create a message, **(iii)** insert an identifier in the message, and **(iv)** cause the message to be delivered to a handset.

- **"Step 6: Content is Delivered"** – In Step 6, the Defendants assert they **(v)** cause the content to be delivered to the handset.

Thus, Defendants' Diagram shows there are *at least* five content delivery operations performed by the Defendants, and *none* of them involve *their* use of handsets they purchased. In contrast, the other steps in Defendants' Diagram (identified in red) are the steps or operations that Defendants allege are performed "by handsets." However, Defendants implicitly admit that each of those "red" steps is performed by *third party* purchasers of handsets.

For purposes of this motion, it does not matter that Defendants mischaracterize the Content Claims, and that *none* of the Content Claim actually recite those "red" steps. *See* Response Statement of Facts ¶ 36, 47. What matters is the simple, undisputed fact that Defendants assert Exhaustion *not* due to *their* purchase and use of handsets, but rather, on a *third party's* purchase and use of a handset.

### III. EXHAUSTION APPLIES TO DOWNSTREAM PURCHASERS OF AN "AUTHORIZED ITEM"

The Supreme Court has repeatedly explained that Exhaustion protects the "downstream" purchaser or user of a particular item so that he can use that item as intended without fear of further charges of infringement. Neither the Supreme Court, nor any other court, has extended

3

Exhaustion beyond the purchaser/user of a particular authorized item to protect the activities of a third-party provider of a complementary item or service that constitutes its own direct infringement.

Over 165 years ago, in *Wilson v. Rousseau*, 45 U.S. 646, 684 (1846), the Supreme Court considered whether a statute permitting term extensions of issued patents should benefit assignees or purchasers as well as the patentee. The Court found that it should benefit *purchasers*, based in part on public policy:

> [Issued patents] embrace articles to be found in common use in every department of labor or art, on the farm, in the workshop, and factory. These articles have been purchased from the patentee, and have gone into common use. But, if the construction against which we have been contending should prevail, the moment the patent of either article is renewed, the common use is arrested, by the exclusive grant to the patentee. It is true the owner may repurchase the right to use, and doubtless would be compelled from necessity; but he is left to the discretion or caprice of the patentee. A construction leading to such consequences, and fraught with such unmixed evil, we must be satisfied, was never contemplated by Congress, and should not be adopted unless compelled to do so by the most express and positive language of the statute.

Later, the Court again distinguished between an assignment of patent (which could be limited geographically or temporally) and the purchase of an authorized item, free of patent rights:

> But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress.

*Bloomer v. McQuewan*, 55 U.S. 539, 549 (1852). To this day, protection of *the purchaser* for *his use* remains the basis for Exhaustion. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 2013 WL 1104736 *13 (S.Ct. 3/19/13) (Lord Coke's early explanation "emphasizes the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of

4

those goods").

The limitation of Exhaustion to purchasers for use, or those in that direct chain of purchase, is reflected in the more recent Supreme Court cases. In *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 457 (1940), the patentee's sale of a patented fuel additive to gasoline refiners protected by Exhaustion sales by those refiners of gasoline with the additive to jobbers and retailers. Similarly, in *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942), authorized sales of blanks for a patented eyeglass lens protected by Exhaustion those that ground and finished the lenses, and those that sold the lenses to retailers and consumers. Finally, in *Quanta Computer Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 638 (2008), authorized sales by the patentee's licensee of chipsets required to practice the patents protected purchasers who put the chips into computers. The Court reiterated that Exhaustion was intended to protect "downstream purchasers of the system." *Id.* at 630.

Indeed, the only circumstance where the Court has applied Exhaustion to anyone not a purchaser for use is in the context of contributory infringement, where the defendant was protected from contributory infringement charges *by the purchaser's exhaustion defense.* For example, the Court considered the liability of a supplier of replacement fabric for patented car roofs in *Aro Mfg.Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961). The shaped fabric was not independently claimed, so liability could only be based on contributory infringement. *Id.* at 601-02. The Court found no contribution because any underlying direct infringement was missing – based on *the car owner's* right to maintain use of the patented combination, i.e., Exhaustion. *Id.* at 604.

Here, in stark contrast, Defendants do not claim that Exhaustion stems from *their purchase or use* of a handset, nor are they anywhere in the downstream chain of ownership of the

5

licensed handsets.[4]   Rather, defendants are complete strangers to the licensed "item" – the handset.  They are charged with direct infringement of the Content Claims, and are not charged with contributory infringement of the Handset Claims.  Therefore patent exhaustion cannot apply to avoid liability for infringement.   Defendants attempt to obscure this issue, arguing that Exhaustion protects *any* use of a licensed item regardless of by whom and without regard to how tangential or remote.  In doing so, they use highly selective quotation from the cases.

For example, defendants argue: "Patent exhaustion ensures that a license 'secure[s]' the 'rights' to make use of the item 'in the ordinary pursuits of life,'" purporting to quote *Quanta*. Brief at 3. The actual quote is: "The Court held that the extension of the patent term did not affect the rights already secured *by purchasers who bought the item for use* 'in the ordinary pursuits of life.'" *Quanta*, 553 U.S. at 625 (omitted words emphasized).

Defendants continue, stating that when a patentee sells a machine, "he receives the consideration for its use."   Brief at 3, *quoting Adams v. Burke*, 84 U.S. 453, 456 (1873). Defendants ignore the rest of that passage, which states that the item is therefore "open to the use *of the purchaser* without further restriction." *Id.*

Defendants conclude their argument: "Therefore, a patentee cannot recover a second royalty if its infringement theory involves the use of a licensed article; '[s]uch a result would violate the longstanding principle that, when a patented item is one lawfully made and sold, there is no restriction on its **use** to be implied for the benefit of the patentee.'" Brief at 3, *quoting*

---

[4] J.C. Penney implicitly acknowledged the "purchaser" limitation in pleading exhaustion.  *See, e.g.,* Answer, Dkt. 34, Twentieth Affirmative Defense ("Upon information and belief, Helferich's claims against J.C. Penney for infringement of the '716 Patent are fully or partially precluded **because the accused products/instrumentalities are supplied, directly or indirectly to J.C. Penney by an entity or entities having an express or implied license** to the patent-in-suit and/or pursuant to the doctrine of patent exhaustion") (emphasis added).  By contrast, no allegation of ownership is made in the Brief.

*Quanta*, 553 U.S. at 630 (emphasis original).[5]  Defendants omit the context for "such a result," which is that "any *downstream purchaser* could nonetheless be liable for patent infringement" if method claims were not exhaustible.  *Quanta*, 553 U.S. at 630 (emphasis added).

No case supports defendants' view that direct infringement by persons divorced from any purchaser of the licensed handsets is protected by Exhaustion.  It is not.

Here, handset purchasers are not subject to further infringement charges for their use of the handsets.  The Content Providers are not accused of infringing (or contributing to the infringement of) the Handset Claims.  Rather, *Defendants* are accused of directly infringing the Content Claims based on the admitted basis that they carry out the content delivery operations *without any use by them of an "authorized item*."  The only operations Defendants assert are carried out by handsets they admit are performed *by third parties*, for which Helferich makes no infringement charges and seeks no recovery.  There ends the Exhaustion concern.

Helferich requests that the Court grant summary judgment that Exhaustion cannot apply to Defendants, who admit that they are not purchasers of the handsets, are not related to the purchasers of handsets, and do not themselves use the handsets to perform the allegedly infringing activities.[6]

## IV.  EXHAUSTION DOES NOT AUTOMATICALLY APPLY TO "ALL INVENTIONS" DESCRIBED IN A COMMON PATENT SPECIFICATION

### A.  The Statute And PTO Rules Recognize That A Single Patent Specification May Describe Many "Independent And Distinct" Inventions.

---

[5] Defendants are also wrong that patentees are barred from collecting multiple royalties for infringement of the same patent.  Where the licensed field is restricted so that the license fee does not reflect the full value of the patented rights, no such prohibition applies.  *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010)(*en banc*).

[6] Defendants make no assertion that "implied license" applies. *See Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1351-52 (Fed.Cir. 2003).

Defendants assert "[w]hen a patented invention is sold, **all** of the patent's claims—including its method claims—are exhausted." *See* Brief at 5. Similarly, Defendants argue as a matter of law "a patentee cannot recover a second royalty if its infringement theory involves the use of a licensed article." *Id*. at 2. To remove any doubt of their expansive view of Exhaustion, Defendants repeat at p. 5:

> When a physical product is made under a valid license, the patent is exhausted and all use of that product for its intended purpose cannot infringe. The exhausted product carries with it the right to use it to practice the patent—by the customer or by others. That is the meaning of the "longstanding doctrine of patent exhaustion."

Thus, according to Defendants, by licensing just the Handset Claims of "the patents" to the handset companies, Helferich necessarily exhausted **all** other claims to **all** other inventions described in "the patents," including any **patentably distinct** claims (e.g., the Content Claims) defining inventions *materially different* from the Handset Clams and not embodied in the handsets. *See* Brief at 8. In short, Defendants seek to apply Exhaustion *carte blanche* to **all** inventions described in "a patent," simply upon the occurrence of a license to **any** invention described in the "the patent," without the need to consider whether "the patent" in fact discloses other distinct and different inventions from that previously licensed.

Defendants' ignore that the Patent Act authorizes inventors to describe in one application numerous distinct but related inventions. Section 112 of the Patent Act requires that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

In complying with § 112, inventors commonly discloses in a single "patent specification" how

distinct but potentially related inventions are "used" together.[7]  In recognition of this common

practice, the Patent Statute provides that the PTO may, in its discretion, issue restriction

requirements when "two or more independent and distinct inventions are claimed in one

application." 35 U.S.C. § 121.  The "restriction process" is not taken lightly by the PTO:

> Since requirements for restriction under 35 U.S.C. 121 are discretionary with the
> Director, it becomes very important that the practice under this section be carefully
> administered.

*See* MPEP § 803 (emphasis original).  The PTO has elaborated on what it means to be

"independent and distinct" inventions:

> The term "independent" as already pointed out, means not dependent, or unrelated. A
> large number of inventions between which, prior to the 1952 Act, division had been
> proper, *are dependent inventions, such as, for example, combination and a
> subcombination thereof; as process and apparatus used in the practice of the process; as
> composition and the process in which the composition is used; as process and the
> product made by such process, etc*. If section 121 of the 1952 Act were intended to direct
> the Director never to approve division between dependent inventions, the word
> "independent" would clearly have been used alone. If the Director has authority or
> discretion to restrict independent inventions only, then restriction would be improper as
> between dependent inventions, e.g., the examples used for purpose of illustration above.
> Such was clearly not the intent of Congress. Nothing in the language of the statute and
> nothing in the hearings of the committees indicate any intent to change the substantive
> law on this subject. On the contrary, joinder of the term "distinct" with the term
> "independent", indicates lack of such intent. *The law has long been established that
> dependent inventions (frequently termed related inventions) such as used for illustration
> above may be properly divided if they are, in fact, "distinct" inventions, even though
> dependent*.

*See* MPEP § 802.01 (emphasis added).  The PTO has also explained in § 802.01what it means

for "related inventions" in one application to be "distinct" in various circumstances:

> Related inventions are distinct if the inventions as claimed are not connected in at least
> one of design, operation, or effect (e.g., can be made by, or used in, a materially different
> process) and wherein at least one invention is patentable (novel and nonobvious) over the

---

[7] As a purely hypothetical example, an inventor of a new earthquake-proof pipeline may disclose in a
single application related – but distinct – inventions, such as novel: cement foundations, steel trusses,
pipeline metallurgy, flow sensors, flow valves, etc.  These are "related" inventions intended to be used
together, but nonetheless can be also be patentably distinct inventions under the Patent Statute.

other (though they may each be unpatentable over the prior art).

In the end, the scope of the monopoly (i.e., the "patent rights") is *always* measured by the claims of the patent: "The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. . . . It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for in the statute." *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510 (1917).[8]

The Patent Statute clearly authorizes a patentee to describe in a patent specification many "independent and distinct" and "materially different" but nonetheless "related" or even "dependent" inventions that may be "used" together.[9]  Through the restriction practice, the PTO *in its discretion* may (but *is not required to*) cause those independent, distinct and materially different – but related/dependent – inventions to issue in different patents.  For pioneering inventions, this process often results in a "family" of patents with: (i) a common specifications, (ii) covering "patentably distinct" inventions, that (iii) are related or even dependent.

---

[8] *See also Aro Mfg.*, 365 U.S. at 339 ("the claims made in the patent are the sole measure of the grant"); John W. Osborne, "An Avoidable Collision in Quanta v. LGE", 7 J Marshall Rev. Intell. Prop. 245, at 270 (2008) ("Making a determination as to the patentably distinctive features as part of an exhaustion analysis requires at least some level of claim construction as well as an examination of the prosecution history and prior art. However, this is no more onerous than the claim construction already required under *Markman v. Westview Instruments, Inc.* in every patent case. All patent infringement cases hinge on a determination of what is actually encompassed by a claim. There is no legitimate reason that an exhaustion analysis should be any less rigorous, particularly since exhaustion applies to the authorized sale of an article embodying a claimed invention. There is no way to determine whether an article embodies a claimed invention without determining what the claimed invention is.  Unfortunately, some courts have glossed over the necessity of a rigorous analysis of claim scope and have instead viewed the exhaustion doctrine as a shorthand way to decide the extent of patent rights without performing a thorough patent analysis.")  (Internal citation omitted.)

[9] MPEP § 802.01 gives as examples, "combination and a subcombination thereof; as process and apparatus used in the practice of the process; as composition and the process in which the composition is used; as process and the product made by such process, etc."

10

Defendants eviscerate the Patent Act by applying Exhaustion **automatically** to **all** distinct inventions described and claimed in a family of common patents upon the occurrence of license to only **one** of them, without consideration of any other factor such as the existence of Field of Use restrictions or the "essential elements" test of *Quanta* and *Univys*.

## B. Field Of Use Licenses Have Long Been Approved

Not surprisingly, companies that invest in technology and related patents have long used "field of use" and other restrictions to license *different* inventions in *different* fields to *different* users (who would otherwise be infringers). The Supreme Court clearly approved this practice:

> The practice of granting licenses for a restricted use is an old one. So far as appears, its legality has never been questioned. The parties stipulated that 'it is common practice where a patented invention is applicable to different uses, to grant written licenses to manufacture under United States Letters Patent restricted to one or more of the several fields of use permitting the exclusive or non-exclusive use of the invention by the licensee in one field and excluding it in another field.'

*General Talking Pictures Corp. v. Western Electric Co.,* 305 U.S. 124, 127 (1938) (citations omitted); *see also General Talking Pictures Corp v. Western Electric Co.*, 304 U.S. 175. 181 (1938) ("Patent owners may grant licenses extending to all uses or limited to use in a defined field"). After *Quanta*, the Federal Circuit reaffirmed "field of use" restrictions:

> As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods. That "exhaustion" doctrine does not apply, however, to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the "use" rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld.

*Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010)(*en banc*). It is therefore clear that "field of use" restrictions in patent licenses are proper.

Exhaustion is a reflection of the limits of the patent monopoly, which is solely a right to

11

exclude others within the limits of the patent grant.  *See Bloomer v. McQuewan*, 55 U.S. 539,

549 (1852).  The focus of Exhaustion is on the "patent rights" associated with *the sold or*

*licensed item* – not *other* patentably distinct items *also* described in the patent:  "The

longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented

item terminates all patent rights *to that item*."  *Quanta*, 553 U.S. at 625.  The Supreme Court

clearly did *not* hold (as Defendants wrongly assert) that Exhaustion terminates automatically *all*

patent rights to *all patentably distinct items* disclosed in the Patent, including those *not*

substantially embodied in the sold item.  Consistent with prior rulings, Exhaustion applied only

with respect to inventions fully practiced by the "authorized item."

As a result, Exhaustion based on the sale of a machine has never excused liability based

on infringement of different claims to an independent and distinct component, and vice versa.

As early as 1865, a patentee's sale of a knitting machine was held not to bar a claim based on

independently patented needles made to repair that machine.  *See Aiken v. Manchester Print*

*Works*, 1 F.Cas. 245, 247 (N.H. 1865).  Similarly, the sale of a combination machine was also

held not to bar a later claim based on an independently patented replacement component where

the machine and the component were separately claimed ***in the same patent*** in *C.& R. Research*

*Corp. v. Write*, 19 F.2d 380, 381 (D.Del. 1927).  Still further, purchase of patented "fingers" for

a chicken plucking machine from the patentee did not shield a defendant as to claims for the

machine.  *Hunt v. Armour & Co.*, 185 F.2d 722, 729 (7th Cir. 1950).  "Apparently it is

defendant's view that by purchasing the fingers, which are covered by one group of claims in the

patent, it automatically also obtained a license under the separate group of machine claims.

However, each claim of a patent constitutes a separate monopoly."  *Id.*

The courts have long approved "field of use" and similar restrictions in patent licenses.

12

No court has applied Exhaustion automatically to excuse direct infringement by a third party of *patentably distinct* claims that were properly reserved (i.e., "not authorized") in a prior license using field of use restrictions. To do so simply because the patentably distinct and previously licensed claims are in the "same" patent specification (or even the same patent) is unprecedented and expressly contrary to established law endorsing field of use restrictions.

### C. Exhaustion Has Only Applied To The "Authorized Item" – Not Other Distinctly Different Items Also Described In The Patent

The Supreme Court has focused Exhaustion on the sale of an article, and the patent rights substantially embodied in *that article*, referring neither to Exhaustion of "all" claims nor "all inventions" in patents.

In *Univis*, the Court found that "where one has sold an uncompleted article which, because it embodies essential features of his patented invention, is within the protection of his patent . . . he has sold his invention *so far as it is or may be embodied in that particular article*." 316 U.S. at 250-51. Contrary to Defendants' assertion, nowhere in *Quanta* does the Court say that "[w]hen a patented invention is sold, *all* of the patent's claims – including its method claims – are exhausted." Brief at 5. Any reference in *Quanta* to "method patents" is semantics, not substance; not a single "method patent" was at issue. Each LG patent had both apparatus or system claims *and* method claims, and none were primarily written as method patents.[10]

Moreover, the Supreme Court's analysis in *Quanta* proves false Defendants' view of the law. The district court had applied Exhaustion to the apparatus and system claims, but *not* to the

---

[10] U.S. Patent No. 4,939,641, entitled "Multi-Processor System with Cache Memories," was described in the abstract as a system "wherein a CPU, a main memory means and a bus means are provided. Cache memory means is employed to couple the CPU to the bus means and is further provided with means to indicate the status of a data unit stored within the cache memory means." *See also* U.S. Patent No. 5,379,379, "Memory Control Unit with Selective Execution of Queued Read and Write Requests;" U.S. Patent No. 5,077,733, "Priority Apparatus Having Programmable Node Dwell Time."

method claims. *See LG Electronics, Inc. v. Asustek Computer, Inc.*, 2002 WL 31996860 (N.D. Cal. 2002) (granting summary judgment of Exhaustion); 248 F.Supp.2d 912, 918 (N.D. Cal. 2003) (confirming Exhaustion did not apply to method claims). If Exhaustion applies automatically to an "entire patent" as Defendants assert, the Supreme Court would simply have confirmed that the LG patents *as a whole* were exhausted automatically based on exhaustion of the apparatus or system claims. Instead, the Court undertook the separate analysis to find that the method claims were also exhausted. The Court voiced concern that, otherwise, patentees by "including a method claim" could "shield practically any patented item from exhaustion." 553 U. S. at 630. In other words, the Court considered the possibility that a single method claim could defeat Exhaustion of a patent, and concluded that it should not *if the method claims independently met the test for exhaustion* – not because exhaustion of *some* claims automatically exhausted *all* claims in a patent or family of patents issued on the same specification.

The Supreme Court in *Quanta* required that the sold item "substantially embodies a patent." 553 U.S. at 638. Thus, in *Quanta*, the Intel chip "substantially embodies the patent because *the only step necessary to practice the patent* is the application of common processes or the addition of standard parts. *Everything inventive about each patent is embodied in the Intel Products*." *Id.* at 633 (emphases added); *see also id.* at 632-33, *discussing United States v. Univis Lens Co.*, 316 U.S. 241 (1942)(lens embodied the inventive features because the finishing process was "not unique" but was a "standard process"). If the sold item does not substantially embody distinct inventions also described in the patent, it does not embody "everything inventive about each patent," and Exhaustion does not apply. *Id.*

To apply Defendants' "automatic Exhaustion" rule will undo 150 years of established Supreme Court law and conflict with 35 U.S.C. § 121, which recognizes independent and distinct

14

inventions in a single patent specification.  It will greatly devalue some of the most pioneering

patent "families" that share common specifications and describe many distinct but "related" or

"dependent" inventions properly licensed to in separate "fields."  It would instantly grant free

licenses to scores of third party direct infringers that could use the "umbrella" of an expanded

Exhaustion doctrine to use distinct and valuable inventions withheld by proper field of use

restrictions from earlier licenses to unrelated parties.   The "automatic" expansion of Exhaustion

to "***all*** patentably distinct inventions" in a patent upon the first license of "only one of the

inventions" is not, has never been, and should not be the law.

## V.  CONCLUSION

Exhaustion protects only purchasers of an authorized item.  Defendants are neither

purchasers nor downstream customers of any authorized item; they are not even users of the

licensed handsets.  Exhaustion cannot shield them from liability.  Moreover, exhaustion does not

extend beyond the "authorized item" to other patentably distinct inventions described in the same

specification and separately claimed.  Summary judgment in favor of Helferich is therefore

appropriate on Defendants' defense of patent exhaustion.  *See* Rule 56, FRCP.

RESPECTFULLY SUBMITTED this 16th day of April, 2013.


LAW OFFICES OF STEVEN G. LISA


By:___*/s/ Steven G. Lisa*_____
              Steven G. Lisa (Ill. State Bar # 6187348)
              55 West Monroe Street, Suite 3210
              Chicago, Illinois 60603
              Tel. & Fax: (312) 752-4357

Victoria Curtin (NDIL ID #010897)
Victoria Gruver Curtin, PLC
14555 N. Scottsdale Rd., Ste. 160
Scottsdale, Arizona  85254
Tel.:  (480) 998-3547

Gerald D. Hosier (Ill. State Bar # 7059)
Law Offices Of Gerald D. Hosier, Ltd.
P.O. BOX 12354,
Aspen, CO 81612
Attorneys for Plaintiff/Counterdefendant

16

## <u>CERTIFICATE OF SERVICE</u>

I Laura Keller certify that on April 16, 2013, I personally caused to be served, by

CM/ECF filing, a true and correct copy of "Plaintiff's Cross Motion for Summary Judgment on

Patent Exhaustion":

*/s/ Laura Keller*

Laura Keller