**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> THE NEW YORK TIMES COMPANY, a New York Corporation, *Defendant.* | No. 1:10-cv-04387 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> G4 MEDIA, LLC, a Delaware Limited Liability Company, *Defendant.* | No. 1:11-cv-07395 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> CBS CORPORATION, a Delaware Corporation, *Defendant.* | No. 1:11-cv-07607 <br><br> Hon. John W. Darrah |

| | |
|---|---|
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> BRAVO MEDIA, LLC, a New York Limited Liability Company, *Defendant.* | No. 1:11-cv-07647 <br><br> Hon. John W. Darrah |
| HELFERICH PATENT LICENSING, L.L.C., an Illinois Limited Liability Company, *Plaintiff,* <br><br> v. <br><br> J.C. PENNEY CORPORATION, INC., a Delaware Corporation, *Defendant.* | No. 1:11-cv-09143 <br><br> Hon. John W. Darrah |

**<u>DEFENDANTS' COMBINED JOINT REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR JOINT MOTION FOR
SUMMARY JUDGMENT OF PATENT EXHAUSTION
AND JOINT RESPONSE TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT
FILED UNDER SEAL</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    A.    Exhaustion Operates as a Matter of Law to Prevent Patentees from Taxing
          Subsequent Uses of Authorized Items ................................................................ 2

    B.    HPL Exhausted All of the Patents-in-Suit .............................................................. 9

    C.    The Licensed Handsets Sufficiently Embody the Patents-in-Suit ........................ 14

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Burke,*
   84 U.S. (17 Wall.) 453 (1873) ................................................. 6

*Akamai Technologies, Inc. v. Limelight Networks,*
   692 F.3d 1301 (Fed. Cir. 2012) ............................................. 20

*Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) ............................................. 10

*Aro Mfg.Co. v. Convertible Top Replacement Co.,*
   365 U.S. 336 (1961) ...................................................... 2, 7

*Bloomer v. McQuewan,*
   55 U.S. (14 How.) 539 (1853) ............................................ 5, 8

*Bloomer v. Millinger,*
   68 U.S. (1 Wall.) 340 (1864) ............................................... 15

*Bobel v. Maxlite, Inc.,*
   No. 12-C-5346, 2013 WL 142987 (N.D. Ill. Jan. 11, 2013) .................. 5

*C. & R. Research Corp. v. Write,*
   19 F.2d 380 (D. Del. 1927) ................................................ 11

*Ethyl Gasoline Corp. v. United States,*
   309 U.S. 436 (1940) ...................................................... 12

*Fujitsu Ltd. v. Netgear Inc.,*
   620 F.3d 1321 (Fed. Cir. 2010) ............................................. 19

*General Talking Pictures Corp. v. Western Electric Co.,*
   304 U.S. 175 (1938) ...................................................... 12

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.,*
   123 F.3d 1445 (Fed. Cir. 1997) ......................................... 10, 17

*Hunt v. Armour & Co.,*
   185 F.2d 722 (7th Cir. 1950) ............................................... 11

*In re Katz Interactive Call Processing Patent Litig.,*
   No. 07-CV-2322, 2009 WL 8635161 (C.D. Cal. May 1, 2009) ............... 18

*KSR Int'l Co. v. Teleflex, Inc.,*
   550 U.S. 398 (2007) ...................................................... 10

*Lucent Techs., Inc. v. Gateway, Inc.,*
   580 F.3d 1301 (Fed. Cir. 2009) ............................................. 19

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996) ...................................................... 14

ii

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
  830 F. Supp. 2d 815 (N.D. Cal. 2011) ............................................................................... 19

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
  243 U.S. 502 (1917) ....................................................................................................... 1, 5

*Princo Corp. v. Int'l Trade Comm'n*,
  616 F.3d 1318 (Fed. Cir. 2010) ........................................................................................ 13

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) ............................................ 1, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 16, 17, 19, 20

*Rubber Co. v. Goodyear*,
  76 U.S. (9 Wall.) 788 (1870) ............................................................................................ 12

*Tessera, Inc. v. International Trade Comm'n*,
  646 F.3d 1357 (Fed. Cir. 2011) .................................................................... 1, 9, 10, 13, 14, 18

*TransCore, LP v. Electronic Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009) ........................................................................................ 3, 5

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942) .................................................................................... 9, 10, 17, 18

*Wilson v. Rousseau*,
  45 U.S. (4 How.) 646 (1846) .......................................................................................... 8, 13

**Other Authorities**

Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in* Quanta
  Computer, Inc. v. LG Electronics, Inc., 49 IDEA 517, 530-31 (2009) ..................................... 14

## INTRODUCTION

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). HPL does not deny that there was an initial authorized sale of every handset sold in the United States. Yet HPL wrongly maintains it still has patent rights to those items—specifically, the right to sue over the use of the handsets. The only principle needed to resolve this case is the century-old rule that once a patented item has been "sold," it is "thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it." *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917). But in its latest submissions, HPL redeploys its favored tactic of obfuscation—devoting 30 pages of briefing (not to mention its declarations and response to Defendants' Statement of Undisputed Facts) to "arguments" that simply "add unnecessary complexity" to exhaustion's "straightforward analysis." *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011). HPL's attempts to muddle the exhaustion rule fail:

- First, exhaustion does not "protect" only the initial authorized purchaser. Instead, the initial authorized sale removes the item sold from the patents' grasp forever. Thus, HPL's cross-motion is defeated.

- Second, a patent is exhausted if the seller of a product has a license to the patent or a covenant not to sue from the patent-holder. Here, the entire U.S. wireless handset industry has both. And the law does not permit "a patent drafter" to "shield" its "patented item from exhaustion" by attempting to restrict downstream use, or somehow claw back patent claims from the scope of the license or covenant. *Quanta,*

553 U.S. at 630.

- Third, there are no disputes of fact here. Every issue in dispute is a question of law for the Court, as HPL tacitly conceded by filing its cross-motion.

HPL must bear the legal consequence of its strategic choice to license its entire patent portfolio to the entire handset industry, rather than obtaining separate patents for distinct claims and licensing each patent separately. HPL's patents are exhausted as to the licensed handsets, and accordingly the Court should grant the Defendants' motion for summary judgment.

## ARGUMENT

HPL's patent infringement allegations are barred by the doctrine of patent exhaustion. HPL's decision to license all of its patents (including those asserted in this case) to all U.S. handset manufacturers operated as a matter of law to authorize the practice of its patents in every wireless handset in use in the United States. Once a handset is manufactured and sold, HPL has received its one royalty. HPL cannot sue based on the use of that handset by the initial handset owner, subsequent purchasers, or other alleged users (like Defendants here): if one of the claimed steps is taken outside the patents' reach, there can be no infringement suit. *See generally Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345-46 (1961).

### A. Exhaustion Operates as a Matter of Law to Prevent Patentees from Taxing Subsequent Uses of Authorized Items

In their competing motions for summary judgment, HPL and Defendants agree that

2

exhaustion can and should be decided as a matter of law.[1]  *See* Plaintiff's Cross-Motion for Summary Judgment on Patent Exhaustion at 1-2 (NYT Dkt. No. 258) ("HPL MSJ").  Exhaustion operates as a matter of law to preclude infringement claims based on the use of a patented article. When a patentee authorizes the sale of a patented item, the patent is exhausted as to that item and no subsequent use of that item can infringe.  *Quanta*, 553 U.S. at 625.  The patentee may receive at most one royalty for one item—no matter how many times the article is used.

HPL concedes that it authorized the sale of every handset in the United States that receives the messages and sends the requests for content required for infringement under each of HPL's asserted claims.  SUF ¶¶ 10-11; Plaintiff's Opposition to Defendants' Joint Motion for Summary Judgment of Patent Exhaustion, at 4 (NYT Dkt. No. 256) ("HPL Opp'n") (referring to "[t]he handsets" as "authorized items").  And "whether [the manufacturer]'s sales were authorized" is "[t]he only issue relevant to patent exhaustion."  *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1277 (Fed. Cir. 2009); *see also Quanta*, 553 U.S. at 637 ("Because Intel was authorized to sell its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights.").

HPL authorized the sale of the handsets in two ways: *first*, by granting the handset manufacturers a license to make, use, and sell the handsets, and *second* by entering into a

---

[1]  HPL's halfhearted attempt to make exhaustion into an issue of fact (HPL Opp'n 12) or to identify alleged factual disputes—contradicting its own cross-motion for summary judgment—is unavailing.  Every "dispute" HPL identifies is a question of law for this Court to decide (not a question of fact), irrelevant under the proper approach to patent exhaustion, or both.  HPL previously tried to identify the same factual disputes in an attempt to avoid summary judgment briefing on this issue.  Plaintiff's Response to Motion to Expedite Exhaustion, at 5-13 (JCP Dkt. No. 66).  This Court rejected them, finding "persuasive[ ]" Defendants' argument that "the resolution of their patent exhaustion defense is a legal issue" that could "potentially be case-dispositive."  Opinion Granting Motion to Expedite Exhaustion (NYT Dkt. No. 172).  This ruling was correct; exhaustion is appropriately decided on summary judgment, with no need for claim construction or expert analysis. *See TransCore*, 563 F.3d at 1274 (affirming exhaustion ruling in similar procedural posture).

covenant not to sue.

*First*, HPL authorized the sale by permitting, via license, the handset manufacturers to make and sell the handsets. *See Quanta*, 553 U.S. at 637 ("The License Agreement authorized Intel to sell products that practiced the LGE Patents."). At that time, the HPL patents were exhausted. All exhaustion required was that the license permitted the seller "to make, use or sell" the products. *Id.* at 636 (punctuation omitted).

The law bars HPL from attempting to artfully draft restrictions to preclude application of patent exhaustion. If a license grants the right to make, use, or sell an item, any other restrictions and requirements in that agreement are ineffective as a matter of patent law. *Id.* For example, in *Quanta*, the Court specifically mentioned two such limitations in the license agreement at issue (although there were more): a mandate that the manufacturer notify customers that the patentee "had not licensed those customers to practice its patents," and language that "specifically disclaimed any license to third parties to practice the patents by combining licensed products with other components." *Id.* at 636-37.

The Court held that neither of these restrictions avoided patent exhaustion. The patentee had argued that the manufacturer "could not convey" what the license provided it "was not authorized to sell"—namely the "right to practice the patents" in the way the patentee attempted to reserve. *Quanta*, 553 U.S. at 636. That is the same argument advanced by HPL here. HPL Opp'n 6-7, 9-12. But the Supreme Court unanimously rejected that argument. *Quanta*, 553 U.S. at 636-37. Immediately after paraphrasing the language purporting to deny third parties patent rights, the Court held that "the question whether third parties received implied licenses is ***irrelevant*** because Quanta asserts its right to practice the patents based not on implied license but on exhaustion. ***And exhaustion turns only on Intel's own license to sell products practicing***

*the LGE Patents.*"  *Id.* at 637 (emphasis added).  Because the patentee had granted the manufacturer a license to sell the products, the patent was exhausted.  *Id.*  All other details of the license were a matter of contract between the parties to the license.  *Id.* at 637 n.7 ("We note that the authorized nature of the sale to Quanta does not necessarily limit LGE's other contract rights.").[2]

*Second*, HPL also exhausted its patent rights over the handsets by granting a covenant not to sue.  The Federal Circuit has held that granting a covenant not to sue is a separate way that patents can be exhausted.  *See TransCore*, 563 F.3d at 1274-77.  A covenant not to sue exhausts patent rights *even if it purports to limit the rights of "third-party beneficiaries,"* because such restrictions are inoperative as a matter of patent law.  *Bobel v. Maxlite, Inc.*, No. 12-C-5346, 2013 WL 142987, at *4 & n.3 (N.D. Ill. Jan. 11, 2013) (emphasis added).  Therefore, in spite of HPL's "[c]arefully" attempting to evade patent exhaustion (HPL Opp'n 6), its covenant not to sue exhausted the patents.  When covenanting not to sue for patent infringement, the law does not permit drafting around patent exhaustion—carefully or otherwise.

Having exhausted all of the patents-in-suit as to every handset in the United States, HPL cannot now sue Defendants for sending messages to those licensed handsets and receiving requests for content from those handsets.  Exhaustion "carried" the handsets "outside the monopoly of the patent law and render[ed them] free of every restriction which the vendor may attempt to put upon [them]."  *Motion Picture Patents*, 243 U.S. at 516; *see also Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1853) ("when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly"); *Quanta*, 553 U.S. at 638 ("Intel's

---

[2]  And at any rate, here, as in *Quanta*, the patentee does not "contend[ ] that [the seller] breached the agreement."  *Id.* at 636; HPL Opp'n 10 (noting the lack of a contractual dispute between HPL and the handset manufacturers).

authorized sale to Quanta thus took [LGE's] products outside the scope of the patent monopoly"). In other words, no restrictions can be put on the article's use: once an article is licensed, the patentee "parts with the right to restrict that use." *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873).

Such use is not limited to the person who bought the product at the initial authorized sale; the *article* is forever freed of the patent. *Id.* at 455 ("The true ground on which the [Supreme Court's patent exhaustion] decisions rest is that the sale by a person who has the full right to make, sell, and use such a machine carries with it the right to the use of that machine to the full extent to which it can be used in point of time."). Exhaustion protects the first person to buy a licensed product, the person who buys it from her, *and* that person's friend who uses the product, regardless of the manner of use. It follows the patented *item*, and does not protect only one particular *person*.

The following example illustrates the principle: Alan invents the answering machine and gets a patent on it. Alan's patent has three claims: (1) a product claim to the answering machine; (2) a claim that reads "Leaving a message on the answering machine, said message including the caller's phone number"; and (3) a claim that reads "Receiving a call responding to a message left on the answering machine." Alan licenses his patent to a manufacturer, who makes an answering machine and sells it to Becky. Carl calls Becky and leaves a message with his callback number on the licensed answering machine. Becky calls Carl back.

Under HPL's theory, even though the answering machine is licensed, Alan can sue Carl for infringing claims (2) and (3), because the claims are phrased in such a way as to make Carl the direct infringer. But, for these claims, it takes two to tango: Carl is only practicing the patent because he is communicating with Becky's licensed answering machine. The initial authorized

6

sale of the answering machine took it outside the scope of the patent grant, and Carl cannot be held liable for leaving a message on it or for receiving a call responding to his message. Alan's clever phrasing of a claim to make Carl the subject of the sentence and the licensed answering machine the object of the sentence does not change that result.

Under HPL's interpretation, such simple rephrasing would allow "a patent drafter" to "shield practically any patented item from exhaustion." *Quanta*, 553 U.S. at 630. *Quanta* does not permit such strategic drafting around exhaustion. *See id.* at 629 n.5 (holding ineffective attempts "to draft patent claims that will survive numerous transactions regarding the patented good, allowing the force of the patent to intrude deeply into the stream of commerce" (quotation marks omitted)). This is for good reason: If Becky could not receive messages from anyone who had not purchased an answering machine himself, or return that person's phone calls, Becky's answering machine would be effectively worthless.

As the example shows, it is irrelevant that the handset owners here do not, by their actions alone, infringe the patent. HPL MSJ 7. They do not infringe because "the combination patent covers only the totality of the elements in the claim and . . . no element, separately viewed, is within the grant." *Aro*, 365 U.S. at 344. The actions the handsets perform are necessary, but not sufficient, to constitute infringement. By the same token, the Defendants do not, by their actions alone, infringe. For there to be infringement, a handset must send a request. But that action is licensed. Accordingly, there can be no infringement. In *Aro*, the patent covered a convertible car with a fabric roof. *Aro*, 365 U.S. at 337. The Supreme Court held that the right "to use a patented combination" came with the right to repair, including by placing a new roof on the convertible. *Id.* at 345-46. Because **one** element of the multi-element claim—the new roof—was outside the patent's reach, the Court held, no infringement suit could lie. *Id.*

It therefore does not matter whether the Defendants offer a "service" to the handsets. HPL MSJ 4. Under HPL's erroneous view of the law, the car owner in *Aro* could not hire a mechanic to repair the car, because the mechanic is offering a separate service for which he would be held liable for infringement. The car owner would find the law to be of little comfort if it "protected" only her and not anyone else who might provide a service to car. *Id.* at 5. Similarly here, people who purchased handsets with a feature enabling them to receive text messages and click on links to access content would find that feature to be virtually worthless if no one was able to actually send such messages to their handsets and to provide the content once they clicked the link. That is why exhaustion permits a purchaser to sell the item to others, or otherwise allow others to use the item. (Although the semantics is not critical, both of these sorts of third parties are "downstream" users, in the sense that they are not the initial authorized purchaser. *Quanta*, 553 U.S. at 630). If a patentee could pursue an infringement theory involving the use of a licensed article, "[s]uch a result would violate the longstanding principle that, when a patented item is once lawfully made and sold, there is no restriction on its ***use*** to be implied for the benefit of the patentee." *Id.* (internal punctuation omitted).

The cases that HPL cites confirm that exhaustion protects all uses of the sold article: exhaustion ensures that "the common use" is not "arrested." *Wilson v. Rousseau*, 45 U.S. (4 How.) 646, 684 (1846). Of course, the principal user is frequently its initial buyer, which is why several cases focus on the initial buyer. But the first purchaser is not the only one protected. Instead, "when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly," regardless of who else uses that product. *McQuewan*, 55 U.S. at 549. HPL's contrary rule would allow suits for the use of a product that has been sold in an authorized sale. HPL's rule thus constitutes an impermissible "postsale restriction[ ] on the use of a patented

article." *Tessera*, 646 F.3d at 1370. Indeed, if it were otherwise, *Quanta* and *Univis* could not have come out the same way. The alleged infringers in those cases did not themselves buy a patented item, but rather made one, an action that the Court held they could not be sued for. *See Quanta*, 553 U.S. at 637; *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942).

### B. HPL Exhausted All of the Patents-in-Suit

HPL has licensed every handset sold in the United States. As HPL boasted to the PTO when defending its patents during reexamination proceedings, it has licensed and collected millions of dollars in fees from "the ***entire*** cellular handset industry." Defendants' Statement of Undisputed Facts ¶ 11 (NYT Dkt. No. 233) ("SUF"). HPL also admits here that it licensed the whole industry (although it argues that it restricted those licenses). HPL's Response to Defendants' Joint Statement of Undisputed Facts ¶ 11 (NYT Dkt. No. 257).

Exhaustion is the necessary legal consequence of HPL's patenting and licensing strategy. First, in obtaining its patents, HPL alleges that it initially attempted to combine multiple patentably distinct inventions in one patent, but later filed divisional applications and obtained separate patents. Declaration of John R. Grindon ¶ 32 (NYT Dkt. No. 257-10) ("Grindon Decl."). So far, so good. If HPL believed that it had distinct patents pertaining only to handset functionality and others pertaining only to content, it could have licensed ***only those patents it wanted to license***. Instead, HPL pursued a strategy of licensing ***its entire patent portfolio***—presumably because the handset manufacturers saw that each HPL patent could apply to them—and then ostensibly clawing back particular claims. Defendants' Joint Response to HPL's Statement of Undisputed Facts ¶ 14 ("Defs SUF Resp."). This activity exhausted the patents as a matter of law.

HPL's attempt to claw back particular patent claims (HPL Opp'n 4) fails as a matter of patent law. Carving up a patent by claim and purporting to license only certain patent claims but

not others will not immunize the patent from exhaustion. The sale of a device "that partially practice[s] a patent" completely "exhaust[s] ***that patent***." *Quanta*, 553 U.S. at 635 (emphasis added). Were it otherwise, a patentee could draft a patent with both system and method claims and license only the system claims to try to defeat exhaustion—yet *Quanta* disallowed that very result. *Id.* at 628-30 (a patentee cannot "shield" a "patented item from exhaustion" by refusing to transfer the right to perform "a method claim" in "an assignment contract").

All of the Supreme Court's and the Federal Circuit's cases speak to exhaustion of a patent, not a claim. *See, e.g.*, *Quanta*, 553 U.S. at 627 ("the sale of the lens blanks exhausted the patents on the finished lenses"); *Univis*, 316 U.S. at 252 ("The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers."); *Tessera*, 646 F.3d at 1369 ("At issue here, as in *Quanta*, is whether the patentee has authorized certain sales of products embodying the asserted patent."); *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1455 (Fed. Cir. 1997) ("when a patentee sells a device without condition, it parts with the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device."). This contrasts with the way the courts discuss doctrines that affect claims individually. *Compare, e.g.*, *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 419 (2007) ("If the claim extends to what is obvious, it is invalid under § 103."); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1340 (Fed. Cir. 2010) (en banc) ("[W]e again reverse the district court's denial of JMOL and hold the asserted claims of the '516 patent invalid for failure to meet the statutory written description requirement."). In short, the doctrine is "***patent*** exhaustion" (*Quanta*, 553 U.S. at 625), not "***claim*** exhaustion."

Moreover, as explained in Defendants' opening brief (Joint Memorandum of Law

Supporting Defendants' Motion for Summary Judgment of Patent Exhaustion, at 6-8 (NYT Dkt. No. 232) ("MSJ")), HPL's attempt to withhold certain claims from exhaustion is inconsistent with *Quanta*. *Quanta* held that patents that included method, system, and apparatus claims were exhausted in their entirety by the initial authorized sale of a patented product. "[I]ncluding a method claim" in the patent did not immunize the patentee from exhaustion. *Quanta*, 553 U.S. at 629.[3] It cannot here either.

HPL also offers no answer to Defendants' explanation that application of HPL's rule means that a patentee could obtain an entire suite of independently licensable claims in ***one*** patent, thereby undoing the prohibition on double patenting. MSJ 7.

Against this precedent and logic, HPL cites only two cases purportedly addressing claims within a patent. *See* HPL MSJ 12 (citing *C. & R. Research Corp. v. Write*, 19 F.2d 380 (D. Del. 1927) and *Hunt v. Armour & Co.*, 185 F.2d 722 (7th Cir. 1950)). As an initial matter, neither is binding: one is from a different district court, and the other is from a regional court of appeals long before the Federal Circuit took exclusive jurisdiction over patent appeals, adopting the precedent of the Court of Customs and Patent Appeals. Moreover, neither case grapples with the

---

[3] *Quanta* did not separately analyze each claim to see if each was exhausted. HPL cites no analysis in *Quanta* for this strange proposition. To the contrary, as explained in the text, the Court analyzed exhaustion of whole patents, not individual claims. *See*, *e.g.*, *Quanta*, 553 U.S. at 635 ("The relevant consideration is whether the Intel Products that partially practice a patent—by, for example, embodying its essential features—exhaust ***that*** patent.").

relevant Supreme Court precedent and logic.[4]  Finally, if those two cases could have previously been said to stand for the proposition that a patentee may draft around exhaustion by carving out claims within a patent, they have been abrogated by *Quanta*.

Inaccurately labeling the carve-out a "field of use" restriction does not change this result. HPL's "field of use" cases are about horizontal divisions of licenses between different manufacturers, largely based on geography.  They stand for the unremarkable proposition that a patentee can license one company to make its products in Massachusetts and another company to make its products in New York.  *See Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 799-800 (1870) (upholding a license limited to manufacturing in a particular geographic area); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 346, 456 (1940) (permitting manufacturing licenses "restricted in point of space or time").

HPL's other authorities permit non-geographic ways to horizontally divide the manufacturers.  HPL MSJ 11.  For example, *General Talking Pictures* allowed a patentee to license one manufacturer to make and sell products to commercial theatres and another manufacturer to make and sell products to home users.  *Gen. Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 179 (1938).  For its part, *Princo* (a case about patent misuse, not exhaustion) did not describe what "field of use limitations" it was referring to; its general remarks are explanatory dicta.  *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed.

---

[4]  For example, *C. & R. Research Corp.* addressed whether a defendant's actions fell within its right to repair or were an impermissible reconstruction.  19 F.2d at 381 (opining that "the purchaser may not reconstruct a separately patented part or element of the machine without the consent of the owner of the patent for such part, for such reconstruction would constitute a making of the thing covered by the separate patent, notwithstanding it might properly be considered a repair, when viewed from the standpoint of the machine as a whole. . . . Tested by these principles, the rewinding of the equalizer bar, the wire upon which has been worn out, constitutes, I think, a reconstruction, and not a repair, of the patented bar.") (internal citations omitted).  The word "exhaustion" is not even found in the opinion.

Cir. 2010) (en banc). *Princo* also reflects that a license necessarily grants "'use' rights." *Id.*

In short, none of HPL's cases validate its licensing-and-lawsuit strategy. A patentee cannot vertically divide a single item into licensed and unlicensed uses; that is an ineffective postsale restriction. *See Tessera*, 646 F.3d at 1370; *Quanta*, 553 U.S. at 636-37. To the extent HPL contends that *General Talking Pictures* permitted such postsale restrictions (which is not accurate), such a conclusion is inconsistent with *Quanta*. *Quanta*, 553 U.S. at 636.

Yet another flaw in HPL's license-and-sue strategy is that HPL has not identified the content claims that it says were carved out. SUF ¶ 24. HPL relies on a vague definition of what it wishes were carved out, sometimes combined with a few examples, and cites its expert's legal conclusion that many of the claims asserted here fit that definition. HPL's flawed procedure does not provide users of the licensed products with notice of what claims are covered and what are not. Even HPL's own expert cannot list which claims its licenses withheld, stating only that "[t]here are several hundred 'content only claims' in these patents." Grindon Decl. ¶ 25. Indeed, notwithstanding the fact that the licenses are not available to the public, HPL's own procedure *ensures* that users of the licensed products cannot know what claims are covered and what are not, because HPL identifies different claims as reserved "content claims" in different licenses. Defs SUF Resp. ¶ 18. In this respect, HPL's practice is even less protective than LGE's attempt to withhold claims by giving notice to third parties about what aspects of the patent they could not practice. *Quanta*, 553 U.S. at 636. Without the ability to provide the public with clear notice, exhaustion cannot fulfill its function of "secur[ing]" the "rights" to make use of the item "in the ordinary pursuits of life" (*id.* at 625) and ensuring that such "common use" is not "arrested." *Rousseau*, 45 U.S. at 684. HPL's licensing regime fosters uncertainty, fear of future lawsuits, and the chill of innovation that accompanies such uncertainty and fear. *See Markman*

13

*v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996). Exhaustion removes the "cloud of uncertainty" that HPL has attempted to create. *Tessera*, 646 F.3d at 1370.

### C. The Licensed Handsets Sufficiently Embody the Patents-in-Suit

"[T]he traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patent." *Quanta*, 553 U.S. at 628. The item sufficiently embodies the patent when it "partially practice[s]" the patent—*i.e.*, it performs some of the functions in the patent. *Id.* at 635. *Quanta* explained that "methods . . . may be 'embodied' in a product, the sale of which exhausts patent rights" (*id.* at 628) when the products "embody **only some** of the 'patentably distinct elements and steps' involved in the" patents-in-suit. *Id.* at 634 (emphasis added). Thus, as long as a product's use is necessary for an act of infringement to occur—in other words, it performs a step of a patented claim—the product's sale will exhaust the patent.

Like claim construction, identifying whether a product sufficiently embodies a patent is an issue of law, appropriately resolved on summary judgment. Whether a product practices the patent in part is a matter for legal analysis, performed simply by reading the patents and, if needed, the infringement contentions. Hence, the Court in *Quanta* provided its own legal analysis of sufficient embodiment, without so much as a reference to any factual findings. *See Quanta*, 553 U.S. 630-35; *see also* Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in* Quanta Computer, Inc. v. LG Electronics, Inc., 49 IDEA 517, 530-31 (2009) (explaining that "*Quanta* clearly and unambiguously holds that patent exhaustion follows as a matter of law from any 'authorized' (i.e., non-infringing) sale"). Similarly, *Univis* concluded that the lens blanks sufficiently embodied the patents even though "[t]he record gives no account of the prior art and does not provide us with other material to which, if available, resort might appropriately be had in determining the nature of the alleged invention and the validity and scope of the patent claims founded upon it." *Univis*, 316 U.S. at 248. The Court found it

"unnecessary" to decide the scope of the claims in order to conclude that the lens blanks "embod[ied] the invention." *Id.* at 248-50.

In addition, as Defendants previously explained, practicing the patent need not be the *only* possible use of the licensed article. MSJ 11-13. The license effectively removes the article from the patent's right of exclusivity, such that no use of the licensed article can infringe. *See Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1864) (when patentees "have made and vended to others to be used one or more of the things patented, to that extent they have parted with their exclusive right").

Here, the licensed handsets sufficiently embody HPL's patents as a matter of law such that exhaustion applies. Without a handset performing a licensed function, it is not possible for all of the acts required in the patent claims to occur. Even Claim 1 of the '450 Patent, on which HPL hangs its hat, requires a licensed cell phone to receive a message and retrieve the content. That claim recites "[a] method of providing content to a cell phone" that requires that a content provider "initiat[e] a page to a content subscriber"—in other words, that a content subscriber's licensed handset receive a page from the content provider. Defendants' Reply to HPL's Statement of Additional Facts ¶ 49. In addition, the claim requires "a system *to be contacted* to trigger retrieval of the content." *Id.* (emphasis added). This phrase is set in the passive voice: It is clear that the handset must "contact[ ]" the "system" to "trigger retrieval of the content." *Id.* In other words, just as with HPL's other claims, the handset must send a request for the content. *Id.* Indeed, this appears to be HPL's own interpretation of the claim. HPL's final infringement contentions allege that Defendants infringe Claim 1 of the '450 Patent because a mobile phone retrieves content: the domain names in Defendants' messages, HPL says, "are system addresses for the system that *the mobile phone contacts* to begin the process of retrieving the identified

content."  Defs SUF Resp. ¶ 12 (emphasis added).  Under HPL's own reading, the "mobile phone" must "contact[ ]" the "system" in order to "begin the process of retrieving the identified content." *Id.*

Each and every one of the other asserted patent claims clearly requires the use of a licensed handset before infringement can occur.  SUF ¶¶ 14-20.  They each, in plain terms, require that a message be transmitted to the handset.  *Id.*  And they each, in plain terms, require a "request" or a "reply" coming from the handset.  *Id.*  Indeed, HPL's own expert admits that the other claims require the handset to perform some functions, although he awkwardly tries to paper over the fact that HPL's contentions turn on the handset's operations by calling the handset's actions "part of the environment in which the claimed invention operates and with which the content provider may communicate."  Grindon Decl. ¶¶ 19(b), 20(b), 21(b), 22(b).  He does not explain what he means by "environment" or why his odd labeling makes a difference.  *Id.*  The simple truth remains:  There can be no infringement without use of a licensed handset.

The relation of the asserted patents to handset functionality is amply demonstrated by the patents' own specifications.  In spite of HPL's protestations that its asserted patents are focused on the actions of content providers, the patents themselves belie this argument:  their disclosure is focused on the handset's capabilities.  Defs SUF Resp. ¶¶ 15-17.

HPL's arguments against sufficient embodiment are wrong as a matter of law.  First, HPL argues that the handsets do not sufficiently embody the patents because there is a patentable distinction between the handsets' features and the asserted claims; they are "independent and distinct inventions."  HPL MSJ 10.  *Quanta* rejected this very argument.  553 U.S. at 631 (rejecting LGE's argument that exhaustion did not apply because the Intel Products were "'independent and distinct products' from the systems using the LGE Patents," with a

"patentable distinction" between them).  Here too, the handsets partially practice the patents-in-suit, even though they might substantially embody other patents as well.  *See id.* at 635 ("the exhaustion analysis is not altered by the fact that more than one patent is practiced by the same product").

Second, HPL focuses heavily on an ***alternate*** way that a product can sufficiently embody a patent, even if it would be possible to practice the patent without the product at issue (impossible here, *see supra* at 16).  Under this alternate method, a product (even an unfinished product that is unnecessary to practice the patent) may sufficiently embody a patent if it lacks reasonable and intended noninfringing uses—as was the case in *Quanta* and *Univis*.[5]  This alternative form of sufficient embodiment is satisfied here too.  As Defendants explained, the handsets meet this test because they have no substantial noninfringing uses, in the sense used in the contributory infringement context.  MSJ 13-15.

HPL only halfheartedly contests Defendants' argument demonstrating that the handsets lack noninfringing uses.  To recapitulate:  (1) the noninfringing use question is the same in the contributory infringement context as in the patent exhaustion context; (2) in the contributory infringement context, the noninfringing use inquiry asks whether there are any substantial noninfringing uses ***of the relevant feature*** in the product; (3) here, the relevant feature is the

---

[5]  HPL attempts to transform the Supreme Court's description of certain facts about the patents in *Quanta* and *Univis* into ***requirements*** for exhaustion.  HPL Opp'n 12-15; HPL MSJ 13-15.  But none of the Court's other exhaustion cases even mention such features, and *Quanta* called embodiment of "essential features" merely one "example" of sufficient embodiment.  553 U.S. at 635.  *Quanta* and *Univis* were unique in that both involved unfinished products.  In the more typical case, such as this one, exhaustion is straightforward:  "when a patentee sells a device without condition, it parts with the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device."  *Repeat-O-Type*, 123 F.3d at 1455.  HPL's attempt to find distinctions without a difference resembles LGE's argument that, because the finisher ***removed*** material from the lens blanks in *Univis* and Quanta ***added*** material to the Intel CPUs, LGE could maintain a suit against Quanta.  *Quanta*, 553 U.S. at 634.  The Court rejected that argument.  *Id.*

handset's capability for rendering links from text messages and enabling the user to click on them to access content; and (4) this feature has no substantial noninfringing uses.

On the first point, HPL effectively concedes that the substantial noninfringing use question is the same in the contributory infringement context as in the exhaustion context. HPL Opp'n 13-14. (Although HPL states in a footnote that it "believes" that *Quanta* was stingier towards exhaustion, it provides no reason to think so. HPL Opp'n at 13 n.8. HPL cites only a case holding that they are equivalent. *Id.* (citing *In re Katz Interactive Call Processing Patent Litig.*, No. 07-CV-2322, 2009 WL 8635161, at *7 (C.D. Cal. May 1, 2009)).) This concession is accurate. *Univis* explained that if the sale of the products at issue "would constitute contributory infringement" if *un*licensed, then—when the sale of those products *is* licensed—that sale is exhaustive. *Univis*, 316 U.S. at 249. This rule of symmetry prevents patentees from extracting two royalties—licensing fees from the seller and infringement damages from the end user—on the same product. *See also Tessera*, 646 F.3d at 1369 ("patent exhaustion is designed to prevent a double recovery").[6]

Second, HPL barely addresses the rule that when deciding whether a multi-use product has a "substantial noninfringing use," the focus must be on the relevant component of the product. HPL Opp'n 14. This rule too is amply demonstrated by the case law. MSJ 13-15. HPL gripes that *Univis* and *Quanta* did not explicitly announce such a rule, but that is because *Univis* and *Quanta*—unlike the numerous cases Defendants cite and HPL does not address—did not involve such multifunctional products. The rule also makes eminent sense. If a generally

---

[6] This does not mean that a patentee has a right to one full recovery and therefore a court should hold claims not exhausted when a patentee obtained a "reduced fee" from its licensing. *Tessera* specifically rejected the argument that a patent should not be held exhausted because "a finding of patent exhaustion here would deprive [the patentee] from receiving even a single recovery." 646 F.3d at 1369.

useful product like a smartphone could never embody any patent because it has so many noninfringing uses, then no one could be secure having purchased a smartphone that they would not be sued for patent infringement. Moreover, *Quanta* held that a single product can embody multiple patents, which can only be the case if a whole product can have many noninfringing uses. 553 U.S. at 634-35.

Third, HPL has no response to Defendants' identification of the relevant component of the handset. The relevant feature here is the ability to receive text messages with strings of text that the handset interprets as links and, when the user clicks on the text string to request content, the capability of downloading and displaying that content. MSJ 13. As the cases cited in Defendants' principal brief demonstrate, this is the relevant feature because it is the feature that would contribute to infringement—the feature that required the manufacturers to take a license. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) (an XML editor within Microsoft Word was the relevant feature); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009) (the date-picker within Microsoft Outlook was the relevant feature); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 841-42 (N.D. Cal. 2011) (a component within a phone system was the relevant feature).

Finally, HPL cannot refute that the only use of the link-rendering-and-accessing component is to practice the patents. HPL's expert claims to have identified two noninfringing uses of this component: what he terms "peer-to-peer" and "third party content on third party servers." Grindon Decl. ¶ 24. In both cases, one server, person or entity stores the content while another sends the message containing the link to the content. *Id.* But this is an ***infringing*** use, according to HPL. Under HPL's infringement theory, the patents cover a handset's receipt of a text message containing a link to content and sending a reply requesting the content. One person

sending messages about another person's content would infringe based on HPL's definition of "content provider" and "causing." Defs SUF Resp. ¶ 13. This is so, according to HPL's allegations, even if different servers, different people, or even different entities store the message and send it. *Id.* (Indeed, if the exact same server, person, and entity had to both store the content and send the message, Defendants would not infringe either.)

Moreover, dividing the practice of a method patent between multiple entities, with different entities performing different steps, would not qualify as a substantial noninfringing use under HPL's broad infringement theory. *Akamai Techs. Inc. v. Limelight Networks*, 692 F.3d 1301, 1310 (Fed. Cir. 2012) (en banc) (the statute reaches "cases of divided infringement, even when no single entity would be liable for direct infringement"). Because HPL's identified use still constitutes ***practicing the patent***, it is not a noninfringing use. *See Quanta*, 553 U.S. at 632 n.6 ("the question is whether the product is 'capable of use only in ***practicing*** the patent,' not whether those uses are infringing") (citation omitted).

HPL has tried mightily through its patenting-and-licensing strategy to make "an end-run around exhaustion." *Quanta*, 553 U.S. at 630. But such attempts to obtain multiple royalties from use of the same article fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court grant their motion for summary judgment of patent exhaustion, and deny HPL's cross-motion.

Dated: May 6, 2013                                   Respectfully submitted,

 /s/ R. David Donoghue                                /s/ Brian M. Buroker
R. David Donoghue                                   Brian M. Buroker
Anthony J. Fuga                                     Matthew F. Chandler
**HOLLAND & KNIGHT LLP**                            **GIBSON, DUNN & CRUTCHER LLP**
131 South Dearborn Street, 30th Floor               1050 Connecticut Avenue, N.W.
Chicago, IL 60603                                   Washington, DC 20036
Tel: (312) 263-3600                                 Tel: (202) 955-8541

Fax: (312) 578-6666
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

J. Mitchell Herbert, Jr. (*pro hac vice*)
**HOLLAND & KNIGHT LLP**
10 St. James Ave., 11th Floor
Boston, MA  02116
Tel: (617) 523-2700
Fax: (617) 523-6850
mitchell.herbert@hklaw.com

***Counsel for Defendant J.C. Penney
Corporation, Inc.***


 /s/ Michael Markman
Michael M. Markman (N.D. Ill. ID No.
191388)
Robert Williams (N.D. Ill. ID No. 247428)
**COVINGTON & BURLING LLP**
One Front Street
San Francisco, CA  94111
Tel: (415) 591-6000
Fax: (415) 591-6091

David M. Airan
**LEYDIG, VOIT & MAYER, LTD.**
180 N. Stetson Avenue, Suite 4900
Chicago, IL  60601-6731
Tel: (312) 616-5600
Fax: (312) 616-5700

***Counsel for Defendants G4 Media, LLC; CBS
Corporation; and Bravo Media, LLC***

Michael R. Weiner (Ill. Bar No. 06217025)
Julianne Marie Hartzell (Ill. Bar No.
06270593)
**MARSHALL, GERSTEIN & BORUN LLP**
233 South Wacker Drive
6300 Sears Tower
Chicago, IL  60606-6357
Tel: (312) 474-6300
mweiner@marshallip.com
jhartzell@marshallip.com

Kenneth Richieri, Esq. (Of Counsel)
The New York Times Company
620 Eighth Avenue, 17th Floor
New York, NY  10018
Tel: (212) 556-1995
richierk@nytimes.com

***Counsel for Defendant and Counterclaim
Plaintiff The New York Times Company***

### CERTIFICATE OF SERVICE

       I, Michael R. Weiner, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 6th day of May, 2013, I caused to be served this DEFENDANTS' COMBINED JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT OF PATENT EXHAUSTION AND JOINT RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, via CM/ECF and electronic mail, upon the following counsel of record:

Steven G. Lisa
Donald J. Lisa
James David Busch
Jon E. Kappes
Justin Joseph Lesko
Timothy Sperling
Law Offices of Steven G. Lisa, Ltd.
55 W. Monroe St., Suite 3210
Chicago, IL 60603
stevelisa@patentit.com
donlisa@patentit.com
jamesbusch@patentit.com
jonkappes@patentit.com
justinlesko@patentit.com
timsperling@patentit.com

Victoria Curtin
Victoria Gruver Curtin, PLC
14555 North Scottsdale Road
Suite 160
Scottsdale, AZ 85254
victoria@vcurtin.com


Gerald Douglas Hosier
Law Offices of Gerald D. Hosier, Ltd.
P.O. Box 12354
Aspen, CO 81612
wizard@ozpd.com


       /s/ Michael R. Weiner
       Michael R. Weiner