# United States Court of Appeals
# for the Federal Circuit

———————————

**HELFERICH PATENT LICENSING, LLC,**
**an Illinois limited liability company,**
*Plaintiff-Appellant*

**v.**

**THE NEW YORK TIMES COMPANY,**
**a New York Corporation,**
*Defendant-Appellee*


**J.C. PENNEY CORPORATION, INC.**
*Defendant*


**G4 MEDIA, LLC, THE BON-TON STORES, INC.,**
**BRAVO MEDIA LLC, CBS CORPORATION,**
*Third Party Defendants*

———————————

2014-1196

———————————

Appeals from the United States District Court for the Northern District of Illinois in No. 1:10-cv-04387, Judge John W. Darrah.

———————————

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**HELFERICH PATENT LICENSING, LLC,**
*Plaintiff-Appellant*

**v.**

**G4 MEDIA, LLC,**
*Defendant-Appellee*

_____

2014-1197

_____

Appeals from the United States District Court for the Northern District of Illinois in Nos. 1:11-cv-07395, Judge John W. Darrah.

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**HELFERICH PATENT LICENSING, LLC,**
*Plaintiff-Appellant*

**v.**

**CBS CORPORATION,**
*Defendant-Appellee*

_____

2014-1198

_____

Appeals from the United States District Court for the Northern District of Illinois in Nos. 1:11-cv-07607, Judge John W. Darrah.

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - -

**HELFERICH PATENT LICENSING, LLC,**
*Plaintiff-Appellant*

**v.**

**BRAVO MEDIA, LLC,**
*Defendant-Appellee*

_____

2014-1199

_____

    Appeals from the United States District Court for the Northern District of Illinois in Nos. 1:11-cv-07647, Judge John W. Darrah.

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - -

**HELFERICH PATENT LICENSING, LLC,**
*Plaintiff-Appellant*

**v.**

**J.C.PENNY CORPORATION, INC.**
*Defendant-Appellee*

_____

2014-1200

_____

    Appeals from the United States District Court for the Northern District of Illinois in Nos. 1:11-cv-09143, Judge John W. Darrah.

4        HELFERICH PATENT LICENSING v. THE NEW YORK TIMES

_____

Decided: February 10, 2015

_____

AARON M. PANNER, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, argued for plaintiff-appellant Helferich Patent Licensing, LLC. Also represented by MICHAEL E. JOFFR, BRENDAN J. CRIMMINS; VICTORIA GRUVER CURTIN, Victoria Gruver Curtin, PLC, Scottsdale, AZ; STEVEN G. LISA, Law offices of Steven G. Lisa, Scottsdale, AZ, JON E. KAPPES; GERALD D. HOSIER, Law Offices of Gerald D. Hosier, Ltd., Aspen, CO.

BRIAN BUROKER, Gibson, Dunn & Crutcher LLP, Washington, DC, argued for defendant-appellee The New York Times Company. Also represented by BLAIR A. SILVER; ALEXANDER N. HARRIS, San Francisco, CA.

DARYL JOSEFFER, King & Spalding LLP, of Washington, DC, argued for defendant-appellee J.C. Penney Corporation, Inc. Also represented by ADAM CONRAD, Charlotte, NC; R. DAVID DONOGHUE, Holland & Knight, LLP, Chicago, IL, ANTHONY J. FUGA; BENJAMIN M. STERN, Holland & Knight, LLP, Boston, MA.

EDWARD R. REINES, Weil, Gotshal & Manges LLP, Redwood Shores, CA for third party defendants G4 Media, LLC, Bravo Media LLC, CBS Coporation. Also represented by BYRON BEEBE.

_____

Before TARANTO, BRYSON, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Helferich Patent Licensing, LLC, brought this action against defendants New York Times Co., G4 Media LLC,

CBS Corporation, Bravo Media LLC, and J.C. Penney Corporation, Inc., alleging infringement of various claims of seven patents—U.S. Patent Nos. 7,280,838; 7,499,716; 7,835,757; 8,107,601; 8,116,741; 8,134,450; and 7,155,241. The asserted claims, generally speaking, address systems and methods for handling information and providing it to wireless devices, such as mobile-phone handsets. Other claims in two of these (and other) Helferich patents, claims not asserted here, address handsets and methods of using them.

The United States District Court for the Northern District of Illinois granted summary judgment of non-infringement under the doctrine of patent exhaustion. *Helferich Patent Licensing, LLC v. New York Times Co.*, 965 F. Supp. 2d 971 (N.D. Ill. 2013). It held that, by granting handset manufacturers patent licenses conferring broad authority to sell the handsets, Helferich had exhausted its ability to enforce its patents not only against acquirers of the handsets but also against the defendant content providers who use presumptively distinct inventions to manage content and deliver it to handset users. We reverse, concluding that patent exhaustion has not reached that far and should not be newly extended to do so in these cases.

## BACKGROUND

Helferich owns more than thirty United States patents that cover a range of distinct, though related, wireless-communication technologies. All of the patents that are relevant here derive from a common specification. One subset of Helferich's claims consists of apparatus and method claims directed, generally speaking, to mobile wireless-communication devices (handsets) and receiving and/or requesting certain content. It is useful to call those claims "handset claims." Another subset of Helferich's claims consists of claims directed, generally speaking, to systems and methods for storing and updating

information of various types (content) and sending it to handsets: for example, a mobile-device news service might send a subscriber a message containing the headline of a news article along with website-location information that permits the subscriber, upon choosing to click a hyperlink, to gain access to the complete article. It is useful to call those claims "content claims," reflecting the fact that it is content providers, not possessors of handsets, that practice them.

Only content claims are asserted here. Two of the patents at issue (the '838 and the '716) contain both handset claims and content claims. The other five patents contain only content claims.

We must assume that all claims at issue are valid. The Patent and Trademark Office issued all of the asserted claims—some of them added or amended or confirmed on reexamination (initiated by defendant New York Times, J.A. 616)—thereby raising a presumption of validity. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2252 (2011). Moreover, the PTO required none of the patents containing the asserted content claims to be issued with terminal disclaimers (under 35 U.S.C. § 253 and 37 C.F.R. § 1.321) in light of other patents; thus, it did not conclude that awarding distinct patents would constitute double patenting. *See In re Hubbell*, 709 F.3d 1140, 1145–46 (Fed. Cir. 2013). Specifically, we must assume that all of the asserted content claims are "'patentably distinct from the claims of'" other patents containing handset claims, because neither the PTO nor the district court has determined—and we are not asked to determine—that the asserted content claims are "'obvious over, or anticipated by,'" such handset claims. *Id.* at 1145; *see generally* PTO, Manual of Patent Examining Procedure § 804 (elaborating on double-patenting doctrine). In fact, during prosecution, the PTO, exercising its discretionary authority under 35 U.S.C. § 121, identified a number of separate inventions and demanded that they

not be combined in a single application, leading to multiple "divisional" applications that eventually issued as separate patents.

Claim 1 of the '450 patent is an example of a content claim, one particularly directed to *sending* content to handsets from remote servers:

> 1.  A method of providing content to a cell phone comprising:
>
>> a content provider causing the content to be stored in an internet accessible storage unit;
>>
>> the content provider initiating a page to a content subscriber, the page including a notification that: (i) identifies the content, and (ii) includes an address of a system to be contacted to trigger retrieval of the content, but does not include the content;
>>
>> wherein the page indicates that the content is available for a specified time; and
>>
>> the content provider causing the content identified by the notification to become inaccessible at the internet accessible storage unit after the specified time identified by the initiated page.

'450 Patent, col. 19, lines 22–35; J.A. 295 (certificate of correction).

Claim 7 of the '838 patent is an example of a handset claim:

> 7.  A method of operating a wireless communication device in a communication system that includes a plurality of information storage systems, and a mobile radiotelephone network comprising:

receiving a notification message from the
mobile radiotelephone network, the notifi-
cation message including (a) a system
identifier identifying a particular one of
the plurality of information storage sys-
tems and (b) a message identifier identify-
ing information that is stored in at least
one of the plurality of information storage
systems and which information is intend-
ed for a user of the wireless communica-
tion device;

alerting the user that the notification
message has been received;

receiving input from the user specifying
an action to delete, forward, or reply to be
performed on the information correspond-
ing to the notification message; and

transmitting via a mobile radiotelephone
network, to the information storage sys-
tem identified by the system identifier, an
action identifier corresponding to the ac-
tion specified by the user;

alerting the user that the action specified
by the user has been completed.

'838 patent, col. 1, lines 28–51 (reexam. cert.).

Helferich licensed its portfolio to what, at least at one
time, constituted most—we may assume all—of the
manufacturers of mobile handsets for sale in the United
States. It is undisputed that, under the doctrine of patent
exhaustion, those licenses eliminate for the own-
ers/possessors of handsets acquired from the licensed
manufacturers—"authorized acquirers"—any legal re-
striction the patents would otherwise impose on them

through the patent statute, 35 U.S.C. §§ 154, 271, regarding their sale or use of their handsets.[1]

The licenses themselves generally reflect painstaking efforts to distinguish the conduct of handset makers and possessors from the conduct of others, such as content providers, and to distinguish claims practiced by the former from claims practiced by the latter. (The parties have not clearly identified and explained any differences among the licenses that would alter the analysis here.) The licenses generally indicate that the Helferich portfolio contains many claims that would not be infringed by a handset manufacturer because those claims "expressly recite material additional operations that are carried out (or material additional structure that is added) by Third Parties, including . . . Content Provider[s] . . . and/or are not substantially embodied in the products, services, or methods within the scope of the Licensed Fields," J.A. 2102 (emphasis removed)—such Licensed Fields being defined as "Mobile Wireless Communications Devices" made, used, etc., by the manufacturer licensee, J.A. 2100. The licenses generally disclaim any grant of rights to such content providers and reserve Helferich's enforcement rights against them. J.A. 2102–03. In light of those provisions, the content providers in these cases rely for protection only on the legal doctrine of patent exhaustion, not on a claim of a factually "implied license" to be found in the licenses Helferich granted to manufacturers.

---

[1]   We use "authorized acquirers" to refer to those who acquire title to the article at issue from the patentee or from a licensee authorized to sell, *see LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1374–77 (Fed. Cir. 2013), and those who acquire possession and operational control, as by lease, from such a person, *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917).

*See Helferich*, 965 F. Supp. 2d at 979 ("The right of Defendants and other third parties here to practice [Helferich's] patents is based [on] exhaustion, not on an implied license . . . .").

Between July 2010 and March 2012, Helferich filed complaints against the defendants individually for directly infringing a number of Helferich's content claims. Helferich alleged that all defendants infringe content claims of the '838, '716, '757, '601, '741, and '450 patents and that Bravo and CBS also infringe the '241 patent.[2] Although Helferich alleged indirect infringement in the alternative, it is undisputed—as Helferich asserted in this court without contradiction by defendants, *see* Helferich Opening Br. at 23, 33—that the cases before us involve no allegation by Helferich of indirect infringement based on handset acquirers' direct infringement.

The allegations of infringement focus on defendants' conduct in storing content and delivering it to customers via mobile-device applications, text-messaging subscription services, and third-party networking programs like Facebook and Twitter. For example, Helferich contends that Bravo infringes when it (a) sends a multimedia message service (MMS) text message to a handset user that includes a brief description of video content and a plain-text uniform resource locator (URL) for the video stored on a remote server and (b) delivers that content to the user upon request, as when the user's handset has

---

[2]    The asserted claims are these: '838 patent—claims 9, 10, 12, 13, 15, 16, 18–20, 98–101, 106, 107, 109, and 110; '716 patent—claims 89–91, 94, 103, 104, and 106; '757 patent—claims 1, 2, 6, 11, 18, 20, 37, 44, and 46; '601 patent—claims 1, 3, 4, 9–11, 16, and 17; '741 patent—claims 1–27; and '450 patent—claims 1, 3–8, 10, 13–15, 19–23, 27, and 28. Some of the claims were added or modified during reexamination.

recognized the plain-text URL and converted it into a hypertext-markup-language (HTML) hyperlink and the user clicks the hyperlink. Similarly, Helferich alleges that CBS infringes by sending to its Twitter subscribers text messages containing links to CBS's content.

In March 2013, defendants jointly moved for summary judgment of non-infringement, asserting the affirmative defense of patent exhaustion. Helferich cross-moved for summary judgment, arguing that exhaustion was inapplicable as a matter of law. The district court ruled in defendants' favor and denied Helferich's motion. It concluded that, because Helferich had authorized "every" mobile-phone manufacturer to sell handsets under its license agreements, its ability to assert its claims had been exhausted—not only against handset acquirers, but also against the content providers as third parties interacting with handsets. *Helferich*, 965 F. Supp. 2d at 978.

The court did not focus on the particulars of any of Helferich's claims, whether handset or content claims. Rather, the court relied on the simply stated premise that "[a]ll of the patents-at-issue require the use of a handset device." *Id.* The court did not state that the defendants were using handsets. Nor did it state that handset possessors practiced any of the asserted claims. Thus, it did not state that handset possessors performed all or even *any* of the steps of the claimed methods or, as to the system claims, that they put the claimed systems into service and thereby "used" them. *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) ("[T]o 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it."). The court also did not state that the asserted content claims, to the extent they contemplate someone's use of a handset, require that handset to have the inventive features claimed in particular handset claims. Rather, citing one patent's Abstract, and without reference to

particular claims, the court relied on the conclusion that "[t]he handset devices have the capability to receive content from content providers, and the patents all require devices capable of receiving content or messages." *Helferich*, 965 F. Supp. 2d at 978.

The court reasoned that, because "every handset device has been licensed to practice [Helferich's] patents," "no handset device can infringe [Helferich's] patents." *Id.* Moreover, the court held that the handsets, with the content-and-message-receiving capability, "sufficiently embody the patents in suit." *Id.* As a policy matter, the court added: "There would be little value to the handset manufacturers (or their end users) to have purchased licenses to [Helferich's] patents to receive content from a third-party content provider if the content provider, like Defendants, could not send the message to the licensed handset device without infringing the patent." *Id.* at 978–79. The court held: "Once the handset manufacturers sell the handsets which embody [Helferich's] patents, [Helferich's] patents are exhausted as to all third parties, including Defendants." *Id.* at 979.

On reconsideration, the district court left its decision unaltered except for correcting the omission of a reference to the '241 patent. *Helferich Patent Licensing, LLC v. New York Times Co.*, No. 10-CV-4387, 2013 WL 6354209, at *1 (N.D. Ill. Dec. 4, 2013). Helferich timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

Discussion

We review the district court's grant of summary judgment de novo. *See Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1378 (Fed. Cir. 2013); *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). We read the record in the light most favorable to Helferich (the non-moving party), drawing all reasonable inferences from the evidence in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Naficy v.*

*Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012). Summary judgment requires that there be no reasonably disputed facts capable of altering the outcome. Fed. R. Civ. P. 56(a); *Naficy*, 697 F.3d at 509. Patent exhaustion may be decided by summary judgment when there are no such genuine disputes of material fact. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013).

## A

In defining the issue presented for decision, we begin with the broad premise on which defendants rest their exhaustion defense in this court—a modified version of the broad premise of the district court's holding. In an effort to affirm the one-fell-swoop judgment as to all of the asserted claims, without differentiation among those claims, defendants rely on the simple premise that all of the asserted claims contemplate a use of a handset by a Helferich-authorized handset acquirer (not by the allegedly infringing defendants). Thus, defendants' Statement of the Issue is: "Whether the district court correctly held that [Helferich's] infringement claims are barred due to patent exhaustion because they necessarily involve the use of already-licensed handsets." Defendants' Br. at 3.

Defendants identify the "involve[d]" handset use broadly, though inconsistently. In their Summary of Argument, they say that "[e]very claim of every asserted [Helferich] patent requires some use of a licensed handset: to receive a message *or* to initiate a request for content based on an identifier in the message." *Id.* at 17 (emphasis added). In their Argument, they assert, more restrictively, that "[e]ach asserted claim requires a 'request' or a 'reply' to come from a licensed handset," *id.* at 29, and, still more restrictively, that "[e]very asserted patent claim requires a wireless handset that can render a hyperlink and send a content request," *id.*; *see id.* at 29–31.

In certain respects, defendants' assertions overreach. For one thing, the term "require" works against clear understanding here, because it inaccurately tends to suggest something the accused infringer must do. The district court did not find, and defendants have not argued, that accused infringers of the asserted claims generally, or defendants themselves, "use" the handsets.[3] We will therefore use "contemplate" or "involve" as shorthands when speaking generally, *see* Defendants' Br. at 3, 16, because those words, by their facial imprecision, signal the need to elaborate more precisely. And we will proceed on the premise, accepted by defendants, that only handset owners/possessors, not those who practice the asserted content claims, "use" the handset.[4]

---

[3]    In their brief, defendants never assert that they use the handsets or are alleged in the complaints to do so; nor do they assert, more generally, that persons "using" the methods or systems of the asserted content claims, under 35 U.S.C. § 271, are using the handsets. Instead, from its first pages, the brief (a) pervasively uses passive-voice and other formulations to say that "a handset is used" or "the use of a handset" is required, without designating the subject engaging in that use, *e.g.*, Defendants' Br. at 1–2, 16, 29–31, while (b) sometimes referring specifically to the handset owner/possessor (never the content provider) as the one "using" the handset, *e.g.*, *id.* at 5–7, 13, 24 ("the handset user").

[4]    In a related context, where a defendant's practice of a claimed invention presupposes that other persons engage in additional conduct, we have said that the additional conduct is part of "the environment" in which the claim is practiced, and not something the *defendant* need engage in for infringement to be found. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir.

In addition, as to what use of a handset is contemplated by the asserted claims, defendants' position goes beyond what the district court found and what their citations support. The district court—referring not to particular claims but to the patents as a whole—relied only on the receiving capability of handsets, not on actual receipt of information by handsets or handset-generated requests for information. *Helferich*, 965 F. Supp. 2d at 978–79. Moreover, defendants' few pages of general, selective discussion are not adequate to demonstrate—what was disputed on summary judgment—that all asserted claims contemplate that a handset user will use the handset to initiate a request for content or, even more specifically, that the handset renders text into a user-clickable hyperlink for initiating such a request.[5]  Nor have defendants shown that all asserted claims contemplate that, for infringement to occur, a handset user must

---

2011); *see also Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374 (Fed. Cir. 2011).

[5]  As to text-to-hyperlink rendering generally, defendants cite a Helferich filing during reexamination of the '241 patent (a content-claim-only patent) as saying that the inventive aspect of the handset was the transformation of text strings into clickable links. Defendants' Br. at 5, 30 (citing J.A. 1982). The cited filing does not say that. It distinguishes prior art as containing an alert about emails on the ground that the alert sent to a recipient "does not contain any information identifiers or message identifiers," requiring an interested recipient to "separately pull information from the email list service," which waits to be contacted. J.A. 1982.

Defendants describe only one handset claim in their brief—method claim 7 of the '838 patent, as modified on reexamination. Defendants' Br. at 6–7. That claim does not speak of text-to-hyperlink rendering. *See supra* pp. 7–8.

actually receive information from the accused infringer. For example, method claim 1 of the '450 patent, quoted above, on its face may be read to recite a process that is complete without any handset receipt of information, either a "page" or "content," let alone a handset-generated information request. The content provider's initiation of a page and accessibility of content seem to be enough under the claim language, which has not been construed.

Two limits defining the issue before us are independent of the foregoing problems and are revealed by noting what defendants do not argue. First, like the district court, defendants do not contend that handset possessors practice any of the asserted claims—that such handset users perform the steps of the claimed methods (even *any* of the steps) or put into service and thereby use the claimed systems. Second, defendants do not argue that the content claims' contemplated handset use must involve a handset that has the inventive features claimed in Helferich's handset claims. Although both parties have made suggestions that (some or maybe all) handsets in the market do have features that bring them within some handset claims, *see* J.A. 1023, 2056, 2058; Defendants' Br. at 55, defendants do not argue that infringement of the asserted content claims logically entails a handset user's practice of handset claims or any other claims.[6] The

---

[6]    The only handset claim that defendants discuss—claim 7 of the '838 patent, as modified on reexamination—requires, among other things, that the handset receive from the user an input "specifying an action to delete, forward, or reply to be performed on the information corresponding to the notification message." *See supra* pp. 7–8. Defendants' discussion of the claim does not address that limitation or suggest that it must be met for a handset to do what is contemplated by all asserted content claims. Defendants' Br. at 6–7.

district court did not conclude otherwise. As defendants present these cases to us, then, handset acquirers' practice of handset claims or any other claims is not necessarily implied by content providers' alleged infringement of the content claims.

In short, the premise of defendants' exhaustion defense is that all handsets in the United States are licensed and that the asserted claims contemplate a use of handsets by handset owners/possessors, one that does not necessarily practice any of Helferich's claims. Standing on that simple ground enables defendants to urge across-the-board exhaustion, without differentiation among asserted content claims. We judge the exhaustion defense on the basis presented to us.

## B

We conclude that the exhaustion defense, as framed by defendants here, does not bar Helferich's claims. Based on the record and arguments presented to us, these cases raise an exhaustion question in the context of multiple related and separately patentable inventions. The situation, to simplify, involves a single inventor's coming up with two inventions presumed to be separately patentable, one invention to be practiced by one group of users, the other invention by another group, where each invention tends to make the other more useful when thus separately practiced. Defendants here rely on the reciprocal enhancement of utility to argue that the patentee's licensing of the first group terminates the patentee's rights against the second group for practicing the second invention, when practicing the second invention in some way contemplates the first group's use of a product made under the license (even if not actually embodying the first invention). But the exhaustion doctrine's lifting of patent-law restrictions on a licensed product has never been applied to terminate patent rights in such complementary activities or goods in these circumstances. And we do not

think that this judicially fashioned doctrine should be extended to do so in the present cases.

1

Exhaustion protects an authorized acquirer's freedom from the legal restrictions imposed by the patent statute. The statute grants a patentee the right to exclude others from, *e.g.*, making or using or selling a patented invention, 35 U.S.C. § 154(a)(1), and it then imposes concomitant legal restrictions on acts that violate the exclusivity right by defining, in closely related terms, what it means for a person to "infringe" the right, § 271. Patent exhaustion removes those legal restrictions on certain persons in certain circumstances: it eliminates the legal restrictions on what authorized acquirers "can do with an article embodying or containing an invention" whose initial sale (or comparable transfer) the patentee authorized. *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1766 & n.2 (2013). Specifically, once there has been an authorized sale of a patented item, that sale " 'confers on the purchaser, or any subsequent owner, 'the right to use [or] sell' the thing as he sees fit." *Id.* at 1766 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249–50 (1942)).

In applying and refining the doctrine for a century and a half, the Supreme Court has considered various issues about the doctrine's scope, including issues concerning the character of the article authorized to be sold and its relation to the asserted claims. *See Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008). But the doctrine's protection against infringement allegations has, apparently, always remained within a limit that reflects the core notion that exhaustion lifts legal restrictions on an authorized acquirer. The doctrine has never applied unless, at a minimum, the patentee's allegations of infringement, whether direct or indirect, entail infringement of the asserted claims by authorized acquirers—either because they are parties accused of infringement or

because they are the ones allegedly committing the direct infringement required by the indirect infringement charged against other parties. Here, as noted, that is not so, because infringement of the content claims has not been asserted or shown to require that handset acquirers are practicing those claims.

Thus, in *Quanta*, patent owner LGE alleged direct infringement by Quanta, an authorized acquirer of chips that LGE had authorized Intel to sell. *See id.* at 624. In *Univis*, 316 U.S. at 243–48, an antitrust case, the conduct at issue was patentee Univis's assertion of patent claims against downstream lens wholesalers and retailers after authorizing their acquisition of blanks embodying the claimed invention. *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 455–57 (1940), also an antitrust case, similarly involved a patentee's assertion of patent claims against jobbers' sale of lead-treated fuel that it had authorized refiners to make and to sell to them. In *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 505–08 (1917), patentee Motion Picture Patents had authorized Precision Machine to make and sell film projectors that practiced Motion Picture's patent on film-feeding mechanics, then charged (a) direct infringement by a "playhouse" operator that properly acquired one of the Precision projectors by purchase followed by lease and (b) indirect infringement by a supplier of film to the operator based on the operator's direct infringement by use of the film. *See also Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) (suit against authorized acquirer; "one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place"); *Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425 (1894) (described *infra*); *Hobbie v. Jennison*, 149 U.S. 355 (1893) (suit against authorized acquirer); *Adams v. Burke*, 84 U.S. 453 (1873)

(suit against authorized acquirer); *Bloomer v. Millinger*, 68 U.S. 340, 350 (1863) (suit against authorized maker/owner of machine; exhaustion protects "owner of the machine"); *Bloomer v. McQuewan*, 55 U.S. 539 (1852) (suit against authorized makers/owners of machines).

In short, the decisions finding exhaustion (or relying on exhaustion to reject an antitrust defense) have done so only when the patentee's assertion of infringement was, or depended on, an assertion that an authorized acquirer was using the same invention by infringing the asserted claims. Neither the parties nor we have identified any case from the Supreme Court that has found exhaustion without this common feature.

This court's decisions appear to be in accord. Recently, for example, in *LifeScan*, 734 F.3d at 1365, the patentee rested its allegation of indirect infringement by a manufacturer of disposable test strips used in patented blood-glucose meters on the assertion that use of such strips with such meters would cause direct infringement by the authorized acquirers of the meters. Similarly, in *Keurig*, 732 F.3d at 1374, the patentee rested its allegation of indirect infringement by the seller of coffee pods for use with a patented coffee brewer on the assertion that the use would cause direct infringement by the authorized acquirers of the brewers. *See also TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009) (infringement suit against installation firm given patented articles by purchaser); *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1369–71 (Fed. Cir. 2011) (infringement charge, by ITC, against purchaser of patented articles); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566 (Fed. Cir. 1993) (infringement suit against purchaser of patented articles); *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445 (Fed. Cir. 1997) (infringement suit against purchaser of patented articles).

Because defendants rely heavily on *Keurig*, it is worth stressing that *Keurig* does not depart from this pattern. The allegation by the patentee in *Keurig* was that the defendant was inducing a brewer owner to infringe the asserted method claim.  732 F.3d at 1374.  In that familiar context, the court held that exhaustion covered the method claim because it appeared in a patent that also contained an apparatus claim reading on the acquired brewer.  *Id.* at 1374–75.  That rationale is inapplicable to five of the asserted seven patents here, even aside from whether the rationale's premise is present.  And in fact the premise is missing here: in contrast to *Keurig*, the present cases involve no assertion that the defendants are inducing or contributing to authorized acquirers' infringement of the claims asserted against defendants.

2

Finding exhaustion in the present cases would run counter to the pronouncement of the Supreme Court—dictum in *Morgan*, 152 U.S. 425—that is most on point for the issue presented here.  The Court in *Morgan*, addressing exhaustion, indicated the doctrine would not apply in circumstances where the alleged infringement involved distinct, though related, validly patented inventions.  *Id.* at 435.  This court, among others, has noted *Morgan*'s significance for such circumstances.

In *Morgan*, the plaintiff, Morgan Envelope Co., owned (by assignment) patents on (1) a toilet paper dispenser, (2) an "oval roll" of toilet paper designed to be used with the dispenser, and (3) a combination including the dispenser and the roll.  152 U.S. at 429–31.  The defendant, Albany Perforated Wrapping Paper Co., resold dispensers it had acquired from Morgan (*i.e.*, it was an authorized acquirer), and it also sold its own version of oval rolls; but Morgan "refused to sell [dispensers] except to persons also ordering [Morgan's] paper."  *Id.* at 431–32.  Morgan sued

Albany for infringing both the oval-roll and the dispenser-roll-combination patents by selling new rolls.

The Supreme Court first invalidated Morgan's patent on its "oval roll" technology, *id.* at 427–30, then addressed Morgan's allegation that Albany infringed its combination patents by selling the oval rolls with knowledge that its customers would combine them with dispensers, *id.* at 431–32. The Court concluded that, where an unpatented article (like the oval roll, post-invalidation) "is an article of manufacture perishable in its nature . . . which must be renewed periodically," the patentee could not restrict its sale. *Id.* at 433. Individuals who had lawfully purchased the dispenser-and-roll combination did not infringe the combination patents by refilling the dispensers with the unpatentable rolls, and consequently Albany was free to manufacture and sell paper rolls for a willing consumer's use without risking infringement liability. *Id.* at 435.

In reaching its conclusion, the Court carefully distinguished a circumstance in which the patent owner sold to purchasers two distinct, separately patentable inventions, even when they are designed to be used together. Specifically, the Court approved the treatment of that situation by the Circuit Court for the District of New Hampshire in *Aiken v. Manchester Print Works*, 1 F. Cas. 245, No. 113 (C.C.D.N.H. 1865), speaking through Circuit Justice Clifford. *See Morgan*, 152 U.S. at 435.

In *Aiken*, Walter Aiken owned patents on—and sold as a pair—both a knitting machine and needles specifically designed for use in the machine. *Aiken*, 1 F. Cas. at 245; *see Morgan*, 152 U.S. at 435 (describing *Aiken*). The needles wore out after about four weeks of use, *Aiken*, 1 F. Cas. at 245, and the machine would not work without the patented needles, *id.* at 246. Declaring that the machine and its needles had "become private, individual property," insulated from infringement liability by virtue of an authorized sale, the court held that while owners may

"repair the needles they purchased, . . . they cannot manufacture new ones, without license," because "the needle is subject to a patent." *Id.* at 247. The *Morgan* Court expressly embraced the *Aiken* court's analysis, understanding it to mean that the sale of the machine along with its separately patented needles "did not confer upon the purchaser any right, after the needles were worn out and became useless, to manufacture other needles, and use the same in the knitting machine so sold and purchased." *Morgan*, 152 U.S. at 435.

The *Morgan* Court thus indicated that, even though an authorized buyer of product X was free of the patent owner's patent on that product, the buyer could not, by virtue of his purchase, prevent the patent owner from enforcing his patent as to product Y, even though Y was specifically designed to be used with X and, at a minimum, made X more useful than it otherwise would be and, indeed, was essential to X's utility. In *LifeScan*, *supra*, this court underscored the significance of *Morgan*'s distinction between situations where related, complementary products are both patented and situations where only one is patented. Specifically, *LifeScan* relied on the absence of a patent on product Y (test strips used in a glucose test meter) in concluding that the authorized sale of product X (the glucose meters) exhausted the patent owner's method patent on the two products used together. *LifeScan*, 734 F.3d at 1371 ("To be sure, if a patent had actually issued on the strips, the patentability of the strips could be relevant to exhaustion. That principle was announced in *Morgan* . . . .").

The Seventh Circuit's holding in *Hunt v. Armour & Co.*, 185 F.2d 722, 729 (7th Cir. 1950), is to a similar effect. The patentee had separate (valid) claims on (a) a machine for plucking chicken feathers and (b) components (fingers) for use in the machine. When the patentee sued the defendant for infringement based on use of licensed fingers in machines it had bought from an unlicensed

manufacturer, the defendant urged exhaustion as a defense, on the ground that it had bought, in a sale authorized by the patentee, the components it was using with the machine. *Id.* The Seventh Circuit rejected the defense because of the distinctness of the claimed machine and component inventions. *Id.*; *see also C. & R. Research Corp. v. Write, Inc.*, 19 F.2d 380, 381 (D. Del. 1927) ("[I]n order to sustain the main contention of the defendant, it is essential that there be found in the mere sale of the machine by the patentee an implied license, running to the purchaser and subsequent owners of the machine, to make the separately patented parts to repair the machine as a whole. I think such license cannot be inferred from a mere sale.").

The *Morgan* Court's approval of *Aiken* is contrary to the theory advanced by defendants here—that exhaustion as to product X ends the patentee's rights even as to a validly patented product Y, simply because the intended utility of X would be diminished by permitting the patentee to preserve his patent rights over Y. Under the *Morgan/Aiken* principle, exhaustion is inapplicable even when it is the owner of product X that would also be using product Y. The present cases seem a fortiori ones: here, it is not even the owner of X but someone else who is using Y, to the indirect benefit of X's owner.

### 3

Patent exhaustion is a judicially fashioned doctrine without a specific source in congressionally enacted text stating the terms of this limitation on patent rights. *See Bloomer v. McQuewan*, 55 U.S. at 549–50. We presume, from Congress's refusal to disturb the existing decisional law of this doctrine (which predated the 1952 Act by nearly a century), an implicit authorization to continue applying the doctrine within its familiar boundaries. *See also* 35 U.S.C. § 273(d) (without defining "exhaust[ion]," giving sale or disposition by person having prior-use

defense same exhaustion effect as sale or disposition by patent owner); 35 U.S.C. § 273(b)(2) (2006). But we do not think that Congress has granted the courts a license to erase those boundaries and expand the doctrine into difficult new territory unmapped by lines drawn, or even sketched, by Congress. That would be the result of what defendants stressed at oral argument as their core position—that exhaustion bars patent enforcement based on a practical inquiry into whether enforcement would constrain authorized acquirers' use of the articles they acquired.

The authorities we have described do not support that position in holdings and run counter to it in pronouncements. Moreover, even outside this setting, there is a familiar, common-sense distinction between legal restrictions applicable to one person and indirect (positive or negative) effects on that person of legal constraints imposed on another person. It is reflected, for example, in traditional non-constitutional third-party standing doctrine, whose very existence presupposes that one person may be adversely affected by (suffer injury in fact from) legal constraints on another and yet not have a legal right to seek elimination of those constraints. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 129–31 (2004); *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The role that the exhaustion doctrine has played to date—avoiding re-imposition of section 271 constraints on an authorized acquirer—reflects the doctrine's origin in common-law rules limiting servitudes, and specifically alienability restrictions, on personal property. In *Kirtsaeng v. John Wiley & Sons, Inc.*, the Supreme Court explained the "impeccable historic pedigree" of the Copyright Act's express "first sale" doctrine, codified at 17 U.S.C. § 109(a), which authorizes a lawful owner of a copy to sell or dispose of it without permission from the copyright owner. 133 S. Ct. 1351, 1363 (2013) (describing the doctrine as rooted in the common law's refusal to allow

the seller of property to "control the resale or other disposition of a chattel once sold"). The common-law background, coupled with the fact that exhaustion is triggered by "authorized transfers of title in [the] property" at issue, *LifeScan*, 734 F.3d at 1377, fits the doctrine's limited role to date: ensuring the continued absence of certain legal restrictions on the rights of the *transferee* (and successors) in the acquired item.

Defendants' focus on practical enhanced utility for the authorized acquirer as a basis for limiting a patentee's rights against other persons proves too much. As defendants acknowledged at oral argument, that rationale would sometimes apply to allow invocation of exhaustion to bar the patentee from enforcing a patent claim against the making, selling, and using of new, patentee-unauthorized copies of an article covered by the claim. For example, suppose that buyer A's enjoyment of a walkie-talkie bought with the patentee's authorization would be impaired unless other people (B, C, and D) also had their own copies of the same patented walkie-talkie required for communication with A. Under defendants' rationale, exhaustion could be invoked to bar the patentee's enforcement of the patent to prevent the unauthorized making of copies for, or their sale to or use by, B, C, and D. The inquiry, under defendants' rationale, would be how much A would benefit from being able to communicate with B, C, and D. Oral Argument at 35:30–38:40, *Helferich Patent Licensing, LLC v. The New York Times Co.*, No. 2014-1196; *id.* at 52:45–53:30 (Counsel for defendants: "[I]f the two walkie-talkies . . . required communication with another walkie-talkie, then I think that you would, could have exhaustion as to the individual transactions at issue, because [person A] paid for his walkie-talkie, he should be able to communicate with another person, and at least as to his communications there should be exhaustion.").

That approach would extend exhaustion far beyond the doctrine's traditional scope, and it does not lie within a sensible range of judicial elaboration pursuant to implied congressional authority. The economic implication would be dramatic. As the Supreme Court said in *Bowman* about the suggestion that "simple copying [is] a protected use," if defendants' rationale were accepted as a substitute for a focus on the authorized acquirer's own legal rights, "a patent would plummet in value after the first sale of the first item containing the invention" in a broad range of market circumstances. 133 S. Ct. at 1768. In the walkie-talkie example, the patentee would have to demand an exorbitant, likely unachievable, price for the first item if selling it terminated patent rights as to other potential users. Subjecting patentees to such impracticable limits could be expected to have a depressing effect on investments in innovation in many areas.

It is commonplace that a product in one person's hands can vastly increase in value if many others possess the same product. Telephones, software, and social-networking platforms are just a few of the many products whose value to each individual purchaser increases as more people buy or use the product. *See, e.g.*, Memorandum of the United States of America In Support of Motion To Enter Final Judgment and In Opposition To The Positions of I.D.E. Corporation and Amici, Exh. 1 at 6 (Decl. of Kenneth J. Arrow), *United States v. Microsoft Corp.*, No. C.A. 94–1564 (D.D.C., Jan. 18, 1995); Mark A. Lemley and David McGowan, *Legal Implications of Network Economic Effects*, 86 Cal. L. Rev. 479 (1998). Even more generally, "complementary goods" are pervasive: a television's value to a consumer depends on others' deploying transmission technology and others' creating and transmitting programs; a computer operating system's value depends on the programs written to run on that system. *See* Arrow Decl. at 6; Joseph Farrell & Garth Saloner, *Standardization, Compatibility, and Innovation*,

16 RAND J. Econ. 70, 70–71 (1985). Such phenomena are ubiquitous.

Because complements may be important to a product's success, it is economically sensible to expect a single entity to engage in innovation in complementary goods to jump-start the launch of products and enhance their value.[7] Such economically productive complementary innovation is reasonably likely to generate complementary patents in the hands of a single patentee. Defendants' practical-effects approach would therefore open substantial new fields of inquiry for exhaustion doctrine. And it would do so, as far as we have been shown, with no reliable basis for judicial fashioning of standards that would guarantee an appropriate balance of innovation and efficiency results and set stable, predictable boundaries on what amounts to a rule defining property rights.

Indeed, an expansion of exhaustion doctrine could do harm to existing patterns of licensing. Within the boundaries of the current doctrine of exhaustion, a patentee owning multiple patents covering complementary goods produced by different producers has the freedom to negotiate different licenses, subject to all the complexities and variations of market forces and existing institutional structures. We have no reason to conclude that inefficien-

---

[7]    *See, e.g., Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 721 (D.C. Cir. 2011) (recognizing innovation benefits of some vertical integration, *e.g.*, cable-television operators created much new video programming); Stanley M. Besen & Joseph Farrell, *Choosing How to Compete: Strategies and Tactics in Standardization*, 8 J. Econ. Persp. 117, 123 (Spring 1994); *see generally* David S. Evans, *The Antitrust Economics of Multi-Sided Platform Markets*, 20 Yale J. on Reg. 325 (2003); Daniel F. Spulber, *Solving the Circular Conundrum: Communication and Coordination in Internet Markets*, 104 Nw. U.L. Rev. 537 (2010).

cies result from this freedom—or, more precisely, that this freedom yields greater inefficiencies than would result from an expansion of exhaustion doctrine, or that disrupting arrangements negotiated through this freedom would produce net benefits. In the recognition of what we do not know we find a strong reason to avoid expanding the judicial doctrine as defendants suggest.

Our reluctance to adopt defendants' proposed expansion is in accord with what two scholars have described as our legal tradition's general disfavoring of judicial, flexibility-introducing changes in the "forms" or "dimensions" of property rights. Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property: The Numerus Clausus Principle*, 110 Yale L.J. 1 (2000). Exhaustion doctrine, following the common-law limitation on servitudes on chattels, creates an implied-in-law property right based on an authorized acquisition, beyond what an implied-in-fact analysis would support under "implied license" principles. Caution about expanding the reach of exhaustion is of a piece with the broader judicial practice of generally maintaining the contours of property rights in the absence of legislative prescriptions.

4

Neither statutory provisions nor elements found within existing exhaustion doctrine supply good grounds for extending the doctrine to cover these cases as presented to us. Most generally, Congress has not provided pertinent guidance on exhaustion in the patent setting. In contrast, Congress included an express provision in the Copyright Act stating the terms of a general exhaustion ("first sale") limitation on the copyright law's general grant of exclusivity rights. *See* 17 U.S.C. § 109(a). After extensive industry-wide consultations, Congress also enacted additional protections for lawful acquirers of computer-program copies, limiting copyright owners' rights against third parties in specified circumstances

where authorized acquirers' enjoyment of their copies requires the involvement of the third parties in otherwise-infringing activities.  17 U.S.C. § 117(a)(1).[8]  In the patent statute, Congress has not codified the exhaustion doctrine itself.  Nor has it enacted a counterpart to the copyright law's carefully crafted extension of owner protection—an extension whose existence, however, tends to reinforce the premise that the general "first sale" rule offers limited protection to third parties.  *Cf. eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392–93 (2006) (analogizing the Court's treatment of injunctions between owners of copyrights and patents); *LifeScan*, 734 F.3d at 1375–76 (looking to copyright law to determine whether "authorized sale[s]" include items transferred by gift).

Turning from what can be found in the statutes to exhaustion doctrine itself, defendants rely on the often-

———————————

[8]    Section 117(a) says that "it is not an infringement for the owner of a copy of a computer program to make or *authorize the making* of another copy or adaptation of that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program."   17 U.S.C. § 117(a)(1) (emphasis added); *see Krause v. Titleserv, Inc.*, 402 F.3d 119, 125 (2d Cir. 2005); *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 373–74 (E.D. Va. 2011).   Section 117 resulted from the work of the National Commission on New Technological Uses of Copyrighted Works (CONTU), established by Congress in 1974.  Pub. L. No. 93-573, § 201, 88 Stat. 1873, 1873–74 (1984); *see* Robert P. Merges, *One Hundred Years of Solicitude: Intellectual Property Law, 1900-2000*, 88 Cal. L. Rev. 2187, 2198–200 (2000) ("CONTU . . . might well serve as a paradigm for intellectual property policymaking.").

articulated principle that exhaustion doctrine seeks to prevent "double recoveries." Defendants' Br. at 28 (citing *Keeler*, 157 U.S. at 663 (patentees "are never entitled to but one royalty for a patented machine") (internal quotations omitted)). But that principle has never served as an independent test for determining whether exhaustion applies. It is hard to see how it could do so unless courts first established the dollar value of the proper reward to determine when the patentee had received it and therefore had to stop seeking additional recoveries. Exhaustion doctrine has never required such an inquiry, which would present difficulties akin to those recognized in other areas where the judicial determination of a proper price has been avoided.[9] Instead, the principle of limiting a patentee to one royalty for an embodiment of an invention expresses an underlying goal that is achieved, indirectly, by reliance on other standards that define when exhaustion applies based on the sale of certain items. Once such an item is sold, the conclusion follows that further exaction of royalties from an owner's use of that item would be deemed a "double recovery." Something other than "double recovery," however, must supply the tests to justify ultimately using that language as a conclusion.

In *Quanta*, the Court, following *Univis*, considered whether the authorized sale of an article triggered exhaustion of method claims by asking if the article "sub-

---

[9]     *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004) (in the antitrust context, courts are "ill suited" "to act as central planners, identifying the proper price, quantity, and other terms of dealing"); *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.) ("[A]ntitrust courts normally avoid direct price administration, relying on rules and remedies . . . that are easier to administer.").

stantially embodied" the claimed method. *Quanta*, 553 U.S. at 637, 638; *Univis*, 316 U.S. at 250–51. The Court summarized the inquiry as asking whether the sold article "had no reasonable noninfringing use and included all the inventive aspects of the patented methods." *Quanta*, 553 U.S. at 638. If the two questions were to be transposed into this context, they would not help defendants' case for exhaustion.

As to the "inventive aspects" portion: This court in *LifeScan* indicated that the question is "whether the additional steps needed to complete the invention from the product are themselves 'inventive' or 'noninventive.'" 734 F.3d at 1368. Here, if the inquiry compares handset claims and content claims, we cannot find that either set wholly contains the invention found in the other. Each has its own inventiveness, as the cases come to us.

As we have noted, defendants have not contended or shown that all of the asserted content claims contemplate handset users' use of handset features that bring them within the handset claims. Even aside from the fact that some of the handset claims claim features such as selective enablement and disablement of acknowledgement signals (what has been called "airplane mode"), *see* J.A. 2260–69, we cannot rule out inventiveness in the handset claims apart from the content claims. Conversely, asserted content claims claim operations performed or systems run by content providers, such as updating content, making it inaccessible after a time, and sending provider-crafted content identifications. Handsets, and in particular handsets meeting the limitations of handset claims, do not perform those functions. And defendants have identified no basis in the specification or prosecution history for concluding that, for the asserted content claims, the patented advance over prior art lay in the handsets. *See supra* p. 15 n.5 (noting prosecution history); J.A. 2238–39, 2242–43, 2245–46, 2249 (Helferich's expert discussing

novel features of the content claims not contained in handset claims).

As to the "reasonable noninfringing use" portion of the *Quanta* approach: For reasons related to those just noted, this inquiry, which echoes language in 35 U.S.C. § 271(c) defining contributory infringement, cannot help defendants any more than does the "inventive aspects" inquiry. We so conclude applying this inquiry in accordance with this court's clarification in *LifeScan* that "alternative uses are relevant to the exhaustion inquiry under *Quanta* only if they are both 'reasonable *and intended*' by the patentee." 734 F.3d at 1369 (quoting *Quanta*, 553 U.S. at 631) (emphasis in original).

Thus, we cannot say that the inventions of the asserted content claims have no reasonable use other than one involving someone's practicing of the handset claims, because we cannot say that the asserted content claims call on use of the inventive features of the handset claims: at most an ordinary handset is required. And in the opposite direction, defendants have not persuasively demonstrated what functions the handset claims require; but even if we accept defendants' focus on text-to-hyperlink rendering, Helferich submitted evidence, in opposition to the defendants' summary-judgment motion, that there is a substantial, reasonable, intended use other than one that plays a role in content providers' infringement of the asserted content claims. Specifically, the evidence is that text-to-hyperlink rendering has such a use in receiving, and acting on, a notification from person A about information available from person B (not under A's control), *e.g.*, a URL for B's website. J.A. 2253–55 (noting that "peer-to-peer" sharing of links to a third party's content does not perform all claims of the content patents and nor does a content provider's sharing with subscribers a link to content controlled and hosted by a different content provider).

For those reasons, it is not true that preserving Helferich's rights in the asserted content claims would "render the licenses to the handset industry essentially worthless." Defendants' Br. at 2; *cf. Helferich*, 965 F. Supp. 2d at 978–79 (making the more limited point that licenses from Helferich would provide "little value" to handset makers and users if "the content provider . . . could not send the message to the licensed handset device without infringing the patents"). According to Helferich's evidence, handset users can take advantage of the distinct handset inventions without content providers' practicing the asserted content claims, including by using features like airplane mode and by receiving from one person information for obtaining content at the website of another (not under the former's control). Even more fundamentally, as a practical matter, there is evident value in obtaining a product (and permission to use it)— for example, a network product like the walkie-talkie mentioned above—whose value depends on other people obtaining complementary products, even when the latter must themselves obtain a patent license. This is a commonplace phenomenon, and what the initial product licensees obtain is not just immediate value, which might be limited, but the potential for increasing value as the rights owner acts on its incentive to license the complementary sales. Thus, to the extent that the handset inventions increase in value with the prevalence of content providers' practicing the asserted content claims, handset makers and users, in paying to make and acquire the handsets, obtain benefits that increase over time as Helferich licenses ever more content providers.

If the foregoing aspects of exhaustion doctrine do not aid defendants here, neither do certain aspects of the patent statute that speak to distinctiveness of inventions. As we have already noted, *see supra* pp. 6–7, these cases come to us without any finding or contention that any of the asserted claims flunks the tests of "double patent-

ing"—either the "statutory" or "non-statutory" variety.  In particular, none of the asserted claims in the five patents that contain only content claims have been determined (or argued) to lack patentable distinctiveness over patents that contain handset claims.

Finally, we do not see how defendants are aided, in their effort to treat the handset and content claims as effectively unified, by the history of Helferich's patents at issue.  All of the relevant claims in the Helferich portfolio evidently grew out of a common specification, but it is common for a single specification to describe quite distinct inventions.  Section 121 recognizes that fact by granting the PTO authority to restrict particular applications so as to separate "independent and distinct inventions" into separate applications.  35 U.S.C. § 121.

Here, the PTO imposed a number of restriction requirements.  That fact tends to confirm the independence or distinctiveness of the separated claims, *see* MPEP §§ 802.01, 803 (either suffices for restriction), as does the absence of double-patenting impediments to issuance of the final claims.  On the other hand, two of the patents at issue retain both handset and content claims—but even for them, an inference of lack of distinctiveness is not warranted.  *See* 35 U.S.C. § 121 ("the Director *may* require the application to be restricted" if there are "two or more independent and distinct inventions" (emphasis added)); *id.* ("The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention."); MPEP § 803.01 ("requirements for restriction under 35 U.S.C. § 121 are discretionary with the Director").  In these circumstances, which provide some fuel for each side's argument (though perhaps not the same amount), all we need to say is that, in the end, we do not draw from the patent history any conclusion helpful to defendants' exhaustion defense.

In short, we have scrutinized defendants' argument that the content and handset claims at issue are distinguished only by "semantics," Defendants' Br. at 34, or "artful drafting," *id.* at 39, by which they must mean that different words are used for what amount to the same substance. We have examined all suggested statutorily and doctrinally grounded approaches to defining legal identity of substance. We do not find that the two groups of claims here can be collapsed into one. We see no sound basis for expanding exhaustion doctrine to hold that authorized sales to persons practicing the handset claims exhaust the patentee's rights to enforce the asserted content claims against different persons.

## C

The only issue before us is patent exhaustion. We have decided the issue as it has been framed by the record and arguments in these cases. We reject the defense for the combination of reasons set forth. We need not rule more broadly to indicate which reasons would be sufficient, without others, for rejection of an exhaustion defense framed more narrowly. In particular, we do not foreclose an exhaustion defense that is tied to particular handset claims and targets particular content claims; that establishes premises for such particular claims not asserted or established in the broad-brush defense before us—such as the presence of essentially the same inventive features in paired handset-content claims, as determined under a standard grounded in the statute, and the necessity that someone practice a handset claim for an asserted content claim to be practiced; and that tries to address the other issues we have identified in rejecting the defense presented to us. We express no view on the merits of any such narrower defenses, which are not before us.

CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court.

**REVERSED**